IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ERAN EVANS<br>9773 Arvin Ave.<br>Cincinnati, OH 45231 | )<br>)<br>)<br>) | CASE NO.<br><br>JUDGE: |
| Plaintiff, | )<br>) | |
| v. | )<br>) | **COMPLAINT FOR DAMAGES**<br>**AND INJUNCTIVE RELIEF** |
| THE HILLMAN GROUP, INC.<br>10590 Hamilton Ave.<br>Cincinnati, Ohio 45231 | )<br>)<br>)<br>) | **JURY DEMAND ENDORSED**<br>**HEREIN** |
| **Serve also:**<br>The Hillman Group, Inc.<br>c/o Corp. Service Co. (Stat. Agent)<br>50 West Broad Street, Suite 1330<br>Columbus, OH 43215 | )<br>)<br>)<br>)<br>)<br>) | |
| -and- | )<br>) | |
| TIA SCHAEPER<br>c/o The Hillman Group, Inc.<br>10590 Hamilton Ave.<br>Cincinnati, Ohio 45231 | )<br>)<br>)<br>)<br>) | |
| Defendants. | )<br>) | |

Plaintiff Eran Evans, by and through undersigned counsel, as her Complaint against the Defendant, states and avers the following:

### PARTIES

1. Evans is a resident of the city of Cincinnati, Hamilton County, state of Ohio.

2. Defendant THE HILLMAN GROUP, INC. ("Hillman") is a foreign-incorporated company that conducts business throughout Ohio and the United States. The relevant location with

the events and omissions of this Complaint took place was at 10590 Hamilton Ave., Cincinnati, Ohio 45231.

3. Hillman is, and was at all times hereinafter mentioned, Evans' employer within the meaning of Title VII of the Civil Rights Act of 1964 ("Title VII") 42 U.S.C §2000e and R.C. § 4112.01(A)(2).

4. Upon information and belief, Defendant TIA SCHAEPER is a resident of the state of Ohio.

5. Defendant Schaeper is and/or was an employee of Hillman.

6. Defendant Schaeper did, and at all times hereinafter mentioned, acted directly or indirectly in the interest of Hillman and/or within the scope of her employment at Hillman.

7. At all times referenced herein, Defendant Schaeper supervised and/or controlled Evans' employment at Hillman.

8. At all times referenced herein, Defendant Schaeper was Evans' employer within the meaning of Title VII and R.C. 4112.01(A)(2).

## JURISDICTION & VENUE

9. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that Evans is alleging federal law claims under Title VII.

10. This Court has supplemental jurisdiction over Evans' state law claims pursuant to 28 U.S.C. § 1367, as Evans' state law claims are so closely related to her federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

12. Within 180 days of the conduct alleged below, Evans filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC", Charge No. 473-2020-00013) against Defendants ("EEOC Charge").

13. On or about October 25, 2019, the EEOC issued and mailed a Dismissal and Notice of Rights letter to Evans regarding the EEOC Charge.

14. Evans received the Dismissal and Notice of Rights from the EEOC in accordance with 42 U.S.C. § 2000e-5(f)(1), which has been attached hereto as Plaintiff's Exhibit 1.

15. Evans has filed this Complaint on or before the 90-day deadline set forth in the Dismissal and Notice of Rights.

16. Evans has properly exhausted all administrative remedies pursuant to 29 C.F.R. § 1614.407(b).

## FACTS

17. Evans is a former employee of Hillman.

18. At all times noted herein, Evans was qualified for her position with Hillman

19. At all times noted herein, Evans could fully perform the essential functions of her job.

20. Evans is African-American, placing her in a protected class for her race.

21. Evans worked for as a supply chain planner from July 15, 2019, until Hillman terminated Evans' employment on or about July 18, 2019, purportedly for "not appearing happy" while at work.

22. Evans was the only African-American employee in her area at Hillman.

23. The supply chain planner position remained open for nearly one year prior to Evans' hire.

24. Evans was interviewed for her position by Defendant Schaeper (supply chain manager, Caucasian) and another supervisor of fasteners (name unknown, female, Caucasian) and was given the job offer only a few hours after her interview.

25. Mark Weber (HR business partner, Caucasian) introduced Evans to her new coworkers and reintroduced her to Schaeper.

26. Evans began her work by shadowing Schaeper as Schaeper prepared reports.

27. This process lasted most of Evans' first day. At one point, Schaeper took a call while Evans shadowed for her side business (which Schaeper apparently started roughly one week before that day) selling lip balm and similar products.

28. Around lunch time, Evans started to get up to head out for food and Schaeper asked, "where are you going, girl?"

29. Evans felt that Schaeper was playing into a stereotype in that question, specifically with the word "girl," but didn't comment on the situation as she was new to the job.

30. Schaeper told Evans she was invited to lunch and around five others joined them, including Tina Bolser (another new hire into the supply chain planner role, Caucasian) and the other supervisor who had interviewed Evans.

31. Schaeper kindly paid for Evans' lunch, though didn't seem particularly willing to do so.

32. Schaeper had commented that it was "tradition" for supervisors to buy subordinates' lunches on their first day.

33. This implied to Evans that Schaeper felt forced to pay, particularly as Schaeper spent most of the lunch on her phone rather than engaging the group in conversation.

34. Another person in the lunch party even noted to Schaeper that she was particularly quiet that day.

35. Schaeper responded saying that she "was actually supposed to be dropping off some of her CBD oil lip balm to a beauty salon instead of being [at lunch that day]."

36. After lunch her first day, Schaeper had Evans email her due to multiple automated emails Evans was receiving; Schaeper was trying to stop those emails.

37. Evans, as she typed the email to Schaeper, accidentally wrote "Tina [Bolser]" instead of "Tia [Schaeper]," in the To: line.

38. Schaeper, who was looking over Evans' shoulder, commented, "what is your problem, girl?"

39. Again, Evans felt the word choice to be based around an African-American stereotype, and Evans laughed nervously in response.

40. Schaeper seemed legitimately upset about the clerical error, and Evans, trying to defuse the situation, asked, "girl, though?"

41. Evans laughed about it to downplay the situation, but it bothered her once again.

42. Evans reviewed other material Schaeper provided as reference/training documents for the duration of the day since Schaeper said she was quite busy and did not offer direction on what she wanted Evans to do during that time.

43. When Schaeper returned back to her desk, Evans asked questions about processes she'd learned from the reference material she was given, and Schaeper asked Evans a few questions to test her retention of what she was learning.

44. Schaeper noted Evans' answers were correct and that she was learning fast.

45. Schaeper also mentioned the previous employee who was in Evans' new role, saying that the previous person had "messed up" the job for a year and a half, and it got to the point of substantially interfering with Hillman's business dealings.

46. Schaeper pulled out the previous employee's (who was notably a Caucasian male) performance improvement plan ("PIP") and showed it to Evans.

47. Evans felt this was highly unprofessional, and Schaeper's harsh tone against the previous employee made Evans apprehensive.

48. Schaeper also commented that she was happy when the previous employee resigned.

49. This timeline shows Hillman's disparate treatment in favor of its Caucasian employees.

50. The previous employee, who was apparently quite poor in performance, still had a year and a half to improve (though apparently did not).

51. Schaeper only gave Evans a few days to show her skills, then used an obviously pretextual reason, Evans being seemingly unhappy at work, to terminate Evans' employment after less than a week. This was disparate treatment.

52. On or about Evans' second day, July 16, 2019, Schaeper began scheduling trainings for Evans on her calendar.

53. For that day, Evans was supposed to receive a list of all of the applications and platforms she would be using for her job, along with the logins/passwords so that she could begin setting up her accounts.

54. That info was unfortunately unavailable, so Schaeper had Evans shadow her while she completed more reports.

55. Schaeper intended to have Evans complete those reports once they had figured out the process.

56. Evans also attended a meeting with Schaeper about some issues with Hillman's top suppliers and order preparation timing, specifically about order fill-rates and on-time deliveries, which were some of the biggest issues for those suppliers.

57. Schaeper also asked Evans how she had performed similar processes while at Proctor & Gamble ("P&G," Evans' previous employer), and Evans discussed ways she felt Hillman could improve based on her time with P&G.

58. Evans also asked Schaeper how best to set her priorities for Hillman, to determine what work is to be completed and in what order.

59. While shadowing Schaeper, Evans asked a lot of questions, both to Schaeper and to others on her team.

60. Schaeper asked Justin (LNU) to show Evans how to pull a specific report, but Justin (LNU) did not know how to do so and did not have time to learn how.

61. On or about Evans' third day, July 17, 2019, Schaeper came in roughly twenty minutes late to work and was uncharacteristically quiet.

62. Evans assumed Schaeper was busy, so she continued reviewing her materials and took notes on the work.

63. While asking Schaeper about another work process, Evans also asked if Schaeper was alright.

64. Schaeper mentioned that there was nothing wrong (regarding why Schaeper was quiet), she was just preparing and had lots of meetings because Amy (LNU) was out.

65. The category health meeting that Evans was instructed to attend that day was meant to help bring Jason (LNU, supply chain director over Schaeper, Caucasian) up to speed on the health of Schaeper's categories.

66. Schaeper began to articulate where the problems were and how those problems affected the overall category.

67. When Jason (LNU) replied with some critical feedback, Schaeper became defensive.

68. Schaeper tried to showcase that the situation was improving.

69. Schaeper also rolled her eyes and even ignored Jason (LNU) during the teleconference by playing around on her cell phone.

70. This caused other meeting attendees (e.g. Justin (LNU)) to uncomfortably begin shuffling around in their own phones. No one mentioned that this was a problem.

71. Evans felt the feedback was useful and didn't feel it required any sort of defensive response.

72. After the meeting with Jason (LNU), Schaeper asked for Evans' thoughts on the situation and how it compared to Evans' time with P&G; Evans responded accordingly.

73. Todd (LNU, another supply chain employee, Caucasian) then introduced himself to Evans and stated he would have come earlier but it appeared that Schaeper and Evans were busy.

74. Schaeper responded that Evans had been "taking notes like a good little girl." Again, Evans felt this derogatory, but said nothing in response.

75. Evans was also older than Schaeper, causing Evans to take further offense at the "girl" comments.

76. Schaeper went back into what Evans assumed were other meetings until Schaeper returned about twenty minutes prior to the end of Evans' shift.

77. Schaeper asked for Evans to shadow her again while she completed a report.

78. As Schaeper discussed the report, Evans leaned over to peer into Schaeper's computer screens with a look of serious intent to learn the process, nodding when Schaeper asked her if she understood, all the while absorbing the info so that she could create notes.

79. Schaeper stopped mid-sentence and asked if Evans was okay.

80. Evans confirmed she was fine, and Schaeper commented that Evans "looked bored."

81. Evans denied being bored and said that she was simply watching and learning.

82. Schaeper then commented that Evans looked like she didn't "want to be [t]here."

83. Evans asked how her face gave that impression, and Schaeper said that Evans needed to be cognizant of how her face appeared to others.

84. Schaeper didn't explain how her Evans' face made her look bored. Schaeper had not said anything similar to her Caucasian employees, who Evans had witnessed would have the same determined look on their faces while interacting with Schaeper.

85. Evans thought Schaeper was joking because it was the end of the day, and those who were still in the office all looked the same way Evans looked: engaged.

86. Evans smiled and replied back (a bit jokingly) with a "yay!" Schaeper took this offensively and told Evans that this "is [her] job!"

87. Evans then realized that Schaeper was serious about the comments and asked if Schaeper expected her to be fully smiling throughout the work day. Schaeper said that that was exactly what she expected.

88. Evans asked why this expectation was placed upon her, and Schaeper commented that Evans was supposed to be happy to be there, because they'd chosen her for the position.

89. Disparately, Schaeper did not make these comments to her Caucasian subordinates.

90. Evans asked Schaeper what face she should make to show she was engaged in the training.

91. Schaeper said an "engaged-looking" face, and Evans asked how a serious face did not communicate that message.

92. Schaeper responded, "If you're going to be like this, I just don't know about this!" while gesturing toward Evans, implying that Evans' job was on the line because of the conversation.

93. Evans became very concerned, this was the first time Schaeper had expressed discontent with her.

94. Schaeper then mentioned one of the meetings that day and how Evans did not smile in it either.

95. Evans responded back noting that no one was smiling in the meeting.

96. Schaeper then noted that Evans was on her phone texting for part of the meeting, and Evans noted that her son had gotten injured and she needed to make sure he was ok.

97. Evans also noted that she had seen Schaeper on her phone during the meeting too (as well as throughout the few days of Evans' employment so far), so assumed it was no issue.

98. Evans asked if she should have stepped out of the meeting to deal with her child. Schaeper then commented that, "[the employees] all have lives here."

99. Evans then asked what made Schaeper think she was unhappy and wondered to herself what was happening.

100. Evans asked where this interaction was coming from, and Schaeper said it came from Evans' face. An awkward silence followed as Evans struggled to figure out what was going on, and Schaeper began looking at something on her phone.

101. Evans, unsure of what else to say, noted her shift was over and asked if there was anything else needed at the moment.

102. Schaeper huffed, dropped her phone down a bit aggressively, and said that that was it for the day.

103. Evans left, feeling quite confused and wondering what made her face different than all of the other employees.

104. The following day, on or about July 18, 2019, was Evans' final day at Hillman.

105. Evans came into work and learned from her coworkers that Schaeper had come in early that day.

106. Evans assumed (correctly) Schaeper's early arrival was because of her.

107. At approximately 9 AM, Evans was invited to a "Week One Review Meeting."

108. Weber and Schaeper met with Evans, and Evans quickly realized her employment was about to be terminated.

109. Weber stayed quiet through the meeting, letting Schaeper do all the talking.

110. In the meeting, Schaeper commented that Hillman had an "energetic" culture of being happy at work. Schaeper said it was clear that Evans was not happy there.

111. Evans thought to herself why she was being told she wasn't happy, that she was an adult and wanted to be treated as such.

112. Evans asked what made Schaeper feel that she was not happy, and Schaeper cited Evans slouching in the meetings and that Evans' head was drooping during her training.

113. Evans asked what trainings (Schaeper meant the shadowing) and responded that she was leaning in to see Schaeper's computer screen and was not drooping.

114. Schaeper then mentioned Evans having her phone out during the meeting, to which Evans responded that others (including Schaeper) had them out too.

115. Evans repeatedly asked for specifics on what she had done wrong in her first few days, and Schaeper noted that Evans never asked questions.

116. Evans denied this and repeated several of the questions she had asked during her shadowing.

117. Evans had even commented early in her shadowing that she was sorry for asking so many questions and reiterated that point.

118. Schaeper replied saying that she didn't mean Evans didn't ask one or two (an obvious understatement).

119. Schaeper was clearly unhappy with Evans pushing back on her reasoning and said she would say no more, Evans was simply unhappy at Hillman.

120. Evans asked for an example of how someone could "look engaged," and asked how having a serious face didn't show she was engaged.

121. Schaeper smiled and said that they were going their separate ways.

122. Evans commented to Weber that she felt her termination was wrong and discriminatory, Weber blew off the comment.

123. Defendants' termination of Evans was an adverse employment action against her.

124. Defendants' purported reason for Evans' termination is pretext for racial discrimination.

125. As a result of the above, Evans has suffered damages, including economic damages, as well as severe emotional distress, anxiety, and depression.

**COUNT I: RACIAL DISCRIMINATION IN VIOLATION OF R.C. §4112, et seq.**

126. Evans restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

127. Evans is African-American, and thus is in a protected class for her race.

128. R.C. § 4112 et seq. provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's race.

129. Defendants treated Evans differently than other similarly situated employees based upon her race.

130. Defendants' termination of Evans was an adverse employment action against her.

131. Defendants' purported reason for Evans' termination was pretextual.

132. Defendants actually terminated Evans' employment due to her race.

133. Defendants violated R.C. § 4112 et seq. by terminating Evans because of her race on or about July 18, 2019.

134. Defendants violated R.C. § 4112.02 and R.C. § 4112.99 by treating Evans differently from other similarly situated employees outside her protected class.

135. Defendants violated R.C. § 4112.02 and R.C. § 4112.99 by applying their employment policies in a disparate manner based on Evans' race.

136. Defendants violated R.C. § 4112.02 and R.C. § 4112.99 by applying their disciplinary policies in a disparate manner based on Evans' race.

137. Evans incurred emotional distress damages as a result of Defendants' conduct described herein.

138. As a direct and proximate result of Defendants' acts and omissions, Evans has suffered and will continue to suffer damages.

### COUNT II: RACIAL DISCRIMINATION IN VIOLATION OF TITLE VII
### (Defendant Hillman only)

139. Evans restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

140. Evans is African-American, and thus is in a protected class for her race.

141. Title VII provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's race.

142. Defendant treated Evans differently than other similarly situated employees based upon her race.

143. Defendant's termination of Evans was an adverse employment action against her.

144. Defendant's purported reason for Evans' termination was pretextual.

145. Defendant actually terminated Evans' employment due to her race.

146. Defendant violated Title VII by terminating Evans because of her race on or about July 18, 2019.

147. Defendant violated Title VII by treating Evans differently from other similarly situated employees outside her protected class.

148. Defendant violated Title VII by applying their employment policies in a disparate manner based on Evans' race.

149. Defendant violated Title VII by applying their disciplinary policies in a disparate manner based on Evans' race.

150. Evans incurred emotional distress damages as a result of Defendant's conduct described herein.

151. As a direct and proximate result of Defendant's acts and omissions, Evans has suffered and will continue to suffer damages.

### COUNT III: UNLAWFUL AIDING, ABETTING, AND INCITING OF DISCRIMINATION
### (Defendant Schaeper Only)

152. Evans restates each and every prior paragraph of this complaint, as if it were fully restated herein.

153. Pursuant to R.C. § 4112.02(J), it is unlawful "[f]or any person to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice..."

154. Schaeper aided, abetted, incited, coerced, and/or compelled Hillman's discriminatory termination of Plaintiff.

155. Schaeper aided, abetted, incited, coerced, and/or compelled Hillman's discriminatory treatment of Evans.

156. Schaeper violated R.C. § 4112.02(J) and § 4112.99 by aiding, abetting, and inciting discrimination against Evans.

157. As a direct and proximate result of Defendant's conduct, Evans has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## **DEMAND FOR RELIEF**

WHEREFORE, Evans demands from Defendant the following:

a) Issue a permanent injunction:

   i. Requiring Defendant to abolish discrimination, harassment, and retaliation;

   ii. Requiring allocation of significant funding and trained staff to implement all changes within two years;

   iii. Requiring removal or demotion of all supervisors who have engaged in discrimination, harassment, or retaliation, and failed to meet their legal responsibility to promptly investigate complaints and/or take effective action to stop and deter prohibited personnel practices against employees;

   iv. Creating a process for the prompt investigation of discrimination, harassment, or retaliation complaints; and

   v. Requiring mandatory and effective training for all employees and supervisors on discrimination, harassment, and retaliation issues, investigations, and appropriate corrective actions;

b) Issue an order requiring Defendant to expunge her personnel file of all negative documentation;

c) An award against Defendant for compensatory and monetary damages to compensate Evans for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

d) An award of punitive damages against Defendant in an amount in excess of $25,000;

e) An award of reasonable attorneys' fees and non-taxable costs for Evans' claims as allowable under law;

f) An award of the taxable costs of this action; and

g) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

  /s/ Matthew Bruce
Matthew G. Bruce (0083769)
     Trial Attorney
Evan R. McFarland (0096953)
**THE SPITZ LAW FIRM, LLC**
8354 Princeton-Glendale Rd., Ste. 203,
West Chester, Ohio 45069
Phone: (216) 291-4744 x173
Fax:   (216) 291-5744
Email: Matthew.Bruce@SpitzLawFirm.com
Email: Evan.McFarland@SpitzLawFirm.com

*Attorneys for Plaintiff Eran Evans*

## **JURY DEMAND**

Plaintiff Eran Evans demands a trial by jury by the maximum number of jurors permitted.

                                                 /s/ Matthew Bruce
                                                 Matthew G. Bruce (0083769)