**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| ERAN EVANS, | : | Case No: 1:20-cv-00041 |
| | : | |
| Plaintiff, | : | Magistrate Judge Stephanie K. Bowman |
| | : | |
| vs. | : | **DEFENDANTS' MOTION FOR** |
| | : | **SUMMARY JUDGMENT** |
| THE HILLMAN GROUP, INC., et al. | : | |
| | : | |
| Defendants. | : | |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants The Hillman Group, Inc. ("Hillman") and Tia Schaeper (collectively "Defendants") respectfully move the Court for an Order granting summary judgment in their favor on all claims asserted by the Plaintiff, Eran Evans. There is no dispute as to any genuine issue of material fact, and Defendants are entitled to judgment as a matter of law. This Motion is supported by the following Memorandum, Defendants' Proposed Undisputed Facts attached as **Exhibit 1**, and the deposition testimony of Plaintiff Eran Evans, Defendant Tia Schaeper, and Mark Weber, and other record evidence cited therein.

Respectfully submitted,

*/s/ Megan S. Glowacki*
Megan S. Glowacki (0086572)
Anthony P. McNamara (0093670)
THOMPSON HINE LLP
312 Walnut Street, Suite 1400
Cincinnati, Ohio 45202
Phone: (513) 352-6700
Fax: (513) 241-4771
Megan.Glowacki@ThompsonHine.com
Anthony.McNamara@ThompsonHine.com
*Attorneys for Defendants.*

<u>**MEMORANDUM IN SUPPORT**</u>

I.    <u>**INTRODUCTION**</u>

In early 2019, Hillman's Supply Chain Department experienced significant turnover, causing morale issues among remaining employees. To curb this, Defendant Tia Schaeper, a Caucasian Supply Chain Manager at Hillman, wanted to bring energy and excitement to the Department in order to boost team spirit. In May 2019, Schaeper interviewed **in-person** Plaintiff Eran Evans, an African American female, for the role of supply chain planner. Based on Evans' experience and the energy she exuded at her interview, Schaeper immediately recommended her hire. Schaeper's manager approved the decision based solely on Schaeper's level of excitement and confidence in Evans as a candidate and Hillman offered Evans the job the same day.

The Evans that arrived for work at Hillman in July 2019, however, was not the same one who interviewed with Schaeper. She appeared disengaged in meetings or failed to ask questions or show a semblance of interest in her position. When Schaeper called out Evans on her lack of engagement after three days of work, Evans responded in a tone Schaeper believed was sarcastic and then—looking at the clock—asked if she could leave. Schaeper, disheartened by Evans' responses and fearing she made a mistake in her hiring decision, spoke with her manager about her concerns after Evans exited. Schaeper did not request Evans' termination but, given how early these concerns were present, Hillman decided simply to end its employment relationship with her rather than spend significant time and resources training Evans further.

**This is a case of dueling perceptions**. Schaeper perceived Evans as disengaged and disinterested in a position in which she had only recently started. Evans disputes that and, alternatively, perceived certain alleged body language and words used by Schaeper as evidence of race discrimination, which Schaeper disputes. The difference between these perceptions is that

1

Schaeper's establishes a legitimate, non-discriminatory reason for Evans' termination—the only burden Defendants bear. Conversely, Evans—who bears the ultimate burden of persuasion with respect to her claims in this action—cannot rely on her subjective beliefs and interpretations to survive summary judgment. This Court must only decide whether record evidence exists to question the legitimacy of Defendants' non-discriminatory reason for terminating Evans' employment—her perceived disinterest and disengagement—as pretext for race discrimination. It does not.

Courts examining claims under Title VII and state anti-discrimination statutes "do not act as a 'super personnel department,' overseeing and second-guessing employers' business decisions." *Romano v. Hudson City Sch. Dist.*, 772 Fed. Appx. 258, 267 (6th Cir. 2019) (quoting *Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 626 (6th Cir. 2006)). "The law does not . . . forbid [employers] from making decisions that others may disagree with." *Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996). It simply prohibits illegal discrimination. Thus, while Evans may dispute Schaeper's perception of her work ethic and believe it was *unfair* to be terminated after four days of employment, the record evidence does not suggest that Hillman did so because of her race. Evans' own opinion and speculation, even when viewed in a light most favorable to her, do not create material fact issues as to whether Evans suffered unlawful race discrimination. As such, this Court should enter summary judgment on Plaintiff Evans' claims and dismiss them with prejudice.

## II. STATEMENT OF FACTS

### A. Hillman Hires Evans Based on Schaeper's Strong Recommendation.

Evans applied online in May 2019 for an open supply chain planner role with Hillman. (Defs.' Proposed Undisputed Facts ("PUF"), attached as **Exhibit 1**, at ¶ 1).[1] Schaeper, who had

---

[1] For sake of space, all record citations contained in the PUF are incorporated by reference as if fully rewritten herein.

already interviewed five other candidates (including another African American), reviewed Evans' credentials and scheduled her for an in-person interview. (*Id*. at ¶¶ 2-3).

Schaeper and another Hillman manager interviewed Evans on June 12, 2019. (*Id*. at ¶ 4). The interview occurred in person, and Schaeper knew Evans was African American when interviewing her. (*Id*. at ¶ 5). During the almost forty-minute interview, Schaeper perceived Evans as passionate and enthusiastic about the role. (*Id*. at ¶ 6). Based on these expressions and her responses to Schaeper's situational and technical questions and her observed behavior during the in-person interview, Schaeper believed Evans would be a good fit for the position and team culture. (*Id.* at ¶ 7). Schaeper believed that such personality traits were crucial for a new hire to possess given that her department had recently experienced a number of departures. (*Id*.).

Excited about the prospect of Evans joining her team, Schaeper immediately emailed Hillman Human Resources Business Partner Mark Weber after Evans' in-person interview and asked Weber and her direct manager, who at the time was Jason Cornett, to make an employment offer to Evans. (*Id*. at ¶ 8). A candidate would typically undergo a second-level interview with Cornett, but he was not immediately available to speak with Evans. (*Id*. at ¶ 9). But because Schaeper felt so confident about Evans based on her interview, Schaeper asked that Cornett trust her judgment so that Evans could forego that second interview and receive an offer sooner. (*Id*. at ¶ 10). Cornett agreed and, based upon Schaeper's endorsement, Weber extended an offer of employment to Evans the same day she interviewed – June 12, 2019. (*Id*. at ¶ 11).

**B.** **From the First Day on the Job, Evans' Body Language Demonstrates to Schaeper a Lack of Engagement and Interest in Her Job.**

Evans commenced work with Hillman on July 15, 2019. (*Id*. at ¶ 12). When she arrived, she met with Weber to sign basic onboarding documents. (*Id*. at ¶ 13). Weber also directed Evans

to the location of Hillman's Employee Handbook and other policies on Hillman's intranet portal. (*Id*.). After this onboarding, Evans met with Schaeper for substantive training. (*Id*. at ¶ 14).

Evans' first week of work was scheduled to primarily consist of trainings and shadowing Schaeper. (*Id*. at ¶ 15). On that Monday, July 15, the first day of work, Evans primarily shadowed Schaeper and learned organizational matters: how to save files, save favorites, access to various programs, setting up her printer, etc. (*Id*. at ¶ 16). Schaeper also walked Evans around to introduce her to coworkers, during which Schaeper did not believe Evans appeared engaged or interested in interacting. She was not shaking hands, asking questions, or otherwise engaging in conversation. (*Id*. at ¶¶ 16-17). Instead, Schaeper perceived her as being distant toward her coworkers. (*Id*. at ¶ 17). The remainder of day involved Schaeper training Evans on the reports she would pull as part of her normal job duties. (*Id*. at ¶ 18). Evans did not take any notes during these trainings. (*Id*.).

Schaeper testified that Evans' work in her first week was primarily to read over the training materials provided and attend training meetings. (*Id*. at ¶ 15). During training meetings, Schaeper observed that Evans "was not engaged, not taking notes, not nodding her head that she understands, not asking questions." (*Id*. at ¶ 19 (quoting Deposition of Tia Schaeper ("Schaeper Dep."), Dkt. 28, at 50:8-11)). Schaper wanted and expected her team members to be passionate and enthusiastic about their jobs, so Evans' apparent disinterest and disengagement created concern. (PUF at ¶ 7).

Evans was assigned a cubicle behind and adjoined to Schaeper's cubicle. (*Id*. at ¶ 20). Schaeper could see what Evans was doing any time she walked to or from her desk to go to a meeting or return from the restroom. (*Id*.). In doing so, Schaeper consistently saw Evans on her cell phone. (*Id*.). Schaeper observed Evans on her phone at various points throughout all three full days she worked at Hillman. (*Id*.). Evans' job at Hillman did not require her to use her cell phone,

and Schaeper testified that she did not see other employees on their phones as often as she saw Evans on hers. (*Id*.). This also created concern.

Specifically, Schaeper began to see a difference between the Evans she interviewed and the Evans who started working for Hillman. (*Id*. at ¶ 21). This came to a head on July 17, 2019, Evans' third full day of work. At that time, Evans and Schaeper attended a "category health meeting" with the rest of the supply chain team. (*Id*. at ¶ 22). The purpose of this regular meeting was for the team to meet and discuss the health (i.e., projected fill rates) of various product categories for which the team was responsible, go over any upcoming risks that the team foresaw and talk through how to mitigate them and how or when to communicate them to Hillman leadership. (*Id*.). This was the first team meeting that Evans attended as a Hillman employee. (*Id*.). Every topic addressed during the meeting was critical and relevant to Evans' new job. (*Id*.).

Before the meeting, Schaeper told Evans that it was an important meeting because Evans would be working on certain product categories and would be following up on those categories. (*Id*. at ¶ 23). During the meeting, however, Schaeper observed Evans texting on her phone and appearing disengaged. (*Id*. at ¶ 24). Evans also did not take any notes during the meeting. (*Id*.). This was concerning to Schaeper because these meetings contained "an abundant amount of information pertaining to several categories at a brand-new job that I would not expect anyone on their third day to retain or memorize," and Schaeper would have expected Evans—a new employee learning a new job—to be taking notes during her first team meeting. (*Id*. at ¶ 25 (quoting Schaeper Dep. at 34:22-25)). Other employees, including employees not new, bring laptops and notebooks with them to such meetings. (PUF at ¶ 23). Evans' use of her phone was also of concern to Schaeper as she had witnessed Evans on her phone during each of the first three days of her

orientation. (*Id*. at ¶ 20). Schaeper did not address the matter with Evans initially to give her the benefit of the doubt (*Id*. at ¶ 25).

Later that afternoon, toward the end of the day, Schaeper was conducting another training with Evans. (*Id*. at ¶ 26). Evans was beside Schaeper as Schaeper was showing her screen and walking Evans through the training. (*Id*.). Schaeper could sense there was not much interaction coming from Evans, or any sense of engagement from her, such as nodding, asking questions, taking notes, or otherwise appearing like she was listening or engaged. Nevertheless, Schaeper moved forward with the training. (*Id*. at ¶ 27). After ten to fifteen minutes of talking, Schaeper checked with Evans to ask if she was okay. (*Id*. at ¶ 28). Her intent in doing so was to "giv[e] her [Evans] an opportunity to say…yeah, of course I'm okay or this is how I learn or I don't feel well or I'm having a bad day or anything." (*Id*. (quoting Schaeper Dep. at 86:18-24)). Instead, Evans responded to Schaeper's question with "mm-hmm." (Schaeper Dep. at 86:25).

Not reassured by this response and still having the concerns previously mentioned, Schaeper told Evans that she was "giving off the impression that you're not interested in our trainings." Evans responded "oh, yay, supply chain, I love supply chain," which Schaeper interpreted as a sarcastic response. (PUF at ¶ 29). Schaeper told Evans that she "kn[ew] it sounds silly, but this is your job so I want to make sure you're engaged with your job." (*Id*.). Evans replied by asking Schaeper to tell her how she was not engaged with her job, and Schaeper cited having "observed her [Evans] on her phone, not asking questions, not nodding, all that." (*Id*.).

Evans responded to Schaeper by explaining the reason for being on her phone during the earlier category health meeting. Allegedly, she was texting with her son because she learned he may have gotten hurt and was checking on him. (*Id*. at ¶ 30). Schaeper responded, "absolutely, if you had an issue with your son, I expect you to address it with your family. I didn't know that. All

6

I could see in the moment was that you were present in this important meeting that pertains to your job and you were on your phone the whole time." (*Id*. at ¶ 31 (quoting Schaeper Dep. at 87:17-23). After some additional back-and-forth, Evans "looked at the clock and said, okay, I'm done with my shift, can I go now," and Schaeper ended with: "yes, I think we're done here." (PUF at ¶ 32; Schaeper Dep. at 87:24-88:5[2]).

### C. Schaeper Raises Her Concerns to Her Supervisor and Hillman Terminates Evans' Employment.

After Evans left, Schaeper immediately called her supervisor, Jason Cornett, to ask for advice on how to handle Evans' behavior. (PUF at ¶ 33). Schaeper explained to Cornett that she felt her last interaction with Evans was inappropriate and unprofessional and that she had "observed many instances of her not being engaged with the role, with the job, with her training, and that [she] was worried that this [Evans' employment] was not a great fit for somebody that we were looking for to build a culture of someone excited about supply chain and hopefully turning around the department morale." (*Id*. at ¶ 34 (quoting Schaeper Dep. at 91:11-18)). Schaeper gave Cornett the same examples of Evans' disengagement and unprofessionalism that she had given to Evans just a few moments earlier. (PUF at ¶ 34). Schaeper did not indicate to Cornett that she wanted to terminate Evan's employment. (*Id*.). Cornett told Schaeper that he would call Kim Corbitt, Hillman's then-Chief Human Resources Officer, and then ended the call. (*Id*. at ¶ 35). He then told Schaeper that, after speaking with Corbitt about the matter, the two had decided "that the best course of action would be to part ways [with Evans] and not further any more time and training into somebody who wasn't wanting to be there." (Id. (quoting Schaeper Dep. at 93:22-25)).

The next morning, July 18, 2019, Schaeper, Cornett, and Weber discussed Schaeper's observations of Evans and Cornett's conversation with Corbitt. (PUF at ¶ 36). Schaeper explained

---

[2] All excerpts of citations to the Schaeper Dep. are included within **Exhibit B** to the PUF.

to Weber that, after three days of training and work, Evans generally appeared distracted, disinterested, and disengaged. (*Id*.). Cornett informed Weber that, based upon Schaeper's observations, Corbitt decided to terminate Evans before investing in her further. (*Id*.).

Following that discussion and shortly after Evans arrived for work, Schaeper and Weber met with Evans to notify her of the decision. (*Id*. at ¶ 37). Schaeper repeated to Evans that Hillman was trying to foster a culture of enthusiasm and passion about supply chain, as well as her observation that Evans consistently appeared disengaged and unhappy with her job, and that Evans' demeanor—after only three days of work—led Schaeper to believe that Evans was not suited for the team and the culture she was attempting to foster. (*Id*.). Evans asked for examples, which Schaeper again provided. (*Id*. at ¶ 38). Schaeper then left the room, and Evans told Weber that she felt her termination was discriminatory. (*Id*. at ¶ 39). This was the first—and only—time Evans reported any alleged discrimination to Hillman. (*Id*.).

### D.    Evans' Version of Certain Events.

Turning to Evans' account in this case, her race discrimination claims rest largely on three categories of events. First, Evans cites to three instances in which she claims Schaeper referred to her as "girl." Second, Evans contends that Schaeper was "forced" to take her to lunch on her first day of work, but did not want to. Third, Evans claims that Schaeper—in speaking with her at the end of the business day on her third day of work about her perceived lack of interest and engagement—was "trying to paint me as an angry black woman." While Defendants dispute these contentions, there is no dispute that Evans' only support for these claims is her own opinion.

#### i.    The "Girl" Comments.

Evans claimed Schaeper allegedly referred to her as "girl" on three separate occasions, each of which she allegedly interpreted as having a "racial connotation." The first allegedly

occurred on Evans' first day of work when Schaeper invited her to lunch. Evans alleged that, as she began to leave to get lunch on her own, Schaeper asked "Where are you going, girl?" The second time occurred later that same day after Evans allegedly mistyped a name in an e-mail. Schaeper—who was attempting to assist Evans—allegedly asked "What is your problem, girl?" The third instance occurred on Evans' third day of work following a team meeting, when Schaeper allegedly told a male coworker that Evans had been taking notes "like a good little girl."

Schaeper testified at her deposition that she does not recall specifically referring to Evans as "girl," but that she does use the term "when interacting with friends, coworkers, my sisters, family. So I suppose it's possible." (PUF at ¶ 40). Schaeper will greet male colleagues with "hey dude" or "hey man." (*Id.*). She specifically denied using the term "girl" in the way and context alleged by Evans. (Schaeper Dep. at 106:17-21). However, at summary judgment, Defendants will assume *arguendo* that the words as alleged by Evans—not the implications—were indeed uttered.

### 1. "Where Are You Going, Girl?"

Schaeper took Evans to lunch for her first day as it was tradition to do so. (PUF at ¶ 41). Around lunchtime, Schaeper stopped Evans as Evans was preparing to leave to get food on her own to extend the lunch invitation. (*Id.*). According to Evans, Schaeper asked her, "where are you going, girl?" (Deposition of Eran Evans ("Evans Dep."), Dkt. 27, at 31:9-23[3]). In her Complaint, Evans alleged that she interpreted the word "girl" to have racial connotations and that she "felt that Schaeper was playing into a stereotype in that question[.]" (*Id.*). However, Evans did not ask what Schaeper meant in allegedly using the word or otherwise outwardly object to its use. (PUF at ¶ 42). Instead, Evans testified that she only "felt" that Schaeper used the term in a derogatory way:

> Q:     Do you know…what it means when [Paragraph 29 of the Complaint] says "that Schaeper was playing into a stereotype" in asking, "where are you going, girl?"

---

[3] All excerpts of citations to the Evans Dep. are included within **Exhibit A** to the PUF.

> A:      Just -- it felt like -- it felt like she was trying to -- I don't know, it just felt like she was trying to use a tone where she established some type of authority and maybe to diminish me a bit just by the tone she used, and the fact that, again, this is not usually a phrase you use in professional settings, nor is it, you know, a phrase you use -- I mean, it just seems demeaning given my first day, and I guess there's a stereotype that, you know, black women are less than and they're not considered as women. So I think that's -- I don't know, it's just that feeling that I got where that -- I guess I couldn't understand why she would use that phrase.

(*Id.* (quoting Evans Dep. at 32:12-33:3)). Evans also said she "wasn't sure" if Schaeper referred to her as "girl" in a racially offensive way and that she had no evidence beyond her own perception to support her claim that Schaeper referred to her as "girl" because of her race. (PUF at ¶ 41).

## 2.      "What is Your Problem, Girl?"

Evans testified that, after lunch on her first day of work, she began receiving "multiple automated emails" due to certain technological issues and Schaeper, looking over Evans' shoulder, asked Evans to e-mail her in order to stop those e-mails. (Evans Dep. at 47:6-48:7). Evans intended to send her e-mail to "Tia Schaeper," but accidentally misspelled Schaeper's name. (*Id.*). Evans alleges that Schaeper, witnessing this error, commented, "what is your problem, girl?" (*Id.*). Evans again "felt" the use of the word "girl" was "based around an African-American stereotype," and asked Schaeper in response, "girl, though?" (*Id.* at 49:24-50:14). While Evans never told Schaeper – nor anyone else at Hillman – that she found the term "girl" to be racially insensitive or offensive, Evans claims that Schaeper should have known she was objecting to the term because Evans responded with "girl, though?" (PUF at ¶ 44; Evans Dep. at 51:3-52:5). Evans also claimed that Schaeper simply "could have known" that the use of the term "girl" was "not sitting well" with her. (Evans Dep. at 51:3-52:5). Such feelings and perceptions were never communicated to Schaeper – Evans simply assumed Schaeper should have understood her meaning. (*Id.*).

### 3. "Taking Notes Like a Good Little Girl."

Following the category health meeting on Evans' third full day of work, Evans claims another supply chain employee approached Evans and introduced himself, saying he would have done so earlier but that Evans and Schaeper appeared busy. (Evans Dep. at 70:2-25). According to Evans, Schaeper then stated that Evans "had been 'taking notes like a good little girl." (*Id*.). Evans took umbrage with Schaeper's use of the word "girl" and again "felt" it was derogatory but said nothing in response. (*Id*. at 71:1-23; PUF at ¶ 45). She did not tell Schaeper that she was offended by the alleged comment or ask why Schaeper referred to her as a "girl." (PUF at ¶ 45.). She admitted she did not know what Schaeper intended by the alleged comment and reiterated her earlier claim that she subjectively felt the use of the term to be racially insensitive. (*Id*.). She also admitted that she had no evidence of racial animus in the alleged use of the term beyond her own personal opinion. (*Id*.).

### ii. The First Day Lunch Event.

With respect to the lunch event itself, Schaeper and five or six other employees took Evans out to lunch for her first day of work. (*Id*. at ¶ 41). Schaeper treated, as was tradition for supervisors to do on a subordinate's first day. (*Id*.). No one at Hillman instructed or asked Schaeper to take Evans to lunch and Schaeper paid for Evans' lunch out of pocket and did not expense it. (*Id*.).

Evans stated that she took Schaeper's explanation of "tradition" to mean that Schaeper "felt forced to pay" – which she claimed was further evidence of race discrimination. (Evans Dep. at pp. 37:25-38:19). Evans believed that Schaeper did not actually want to take her to lunch and was instead "forced" to do so as demonstrated by the fact that, according to Evans, Schaeper spent most of the lunch event on her phone and was otherwise particularly quiet. (*Id*.). However, during her deposition, Evans could not explain why she "felt" like Schaeper felt forced to pay for her

lunch, and ultimately reiterated that it was actually "kind" of Schaeper to do so. (PUF at ¶ 43). She also again admitted that she "wasn't sure" if Schaeper's demeanor was motivated by her race and that, outside of her own perception, she did not have any facts or evidence to support the contention that Schaeper's alleged behavior at lunch was based on her race, or was otherwise related to her in any way. (*Id.*). Evans did not ask Schaeper why she allegedly said she "had" to take Evans to lunch, ask Schaeper why she allegedly did not seem happy, or speak with anyone else about Schaeper's alleged demeanor – it was entirely her own perception of events. (*Id.*).

**iii.**    **Schaeper Suggesting Evans Looked Disinterested.**

Finally, Evans claimed that when Schaeper suggested that she appeared disengaged and disinterested after her third day, Schaeper was discriminating against her because "it made me [Evans] feel like…she's trying to paint me as an angry black woman." (Evans Dep. at pp. 78:24-79:2). But, again, Evans confirmed at her deposition that these were her own subjective feelings:

> Q.    …[W]hen you say she was trying to paint you as an…angry black woman, is it your contention that she was stereotyping?
>
> A.    I didn't know, but I was guessing at that point that she was. It felt like she was….

(PUF at ¶ 46 (quoting Evans Dep. at 79:5-9)). Evans, again, was "not sure" if Schaeper made this alleged statement because of her race and never asked Schaeper about her intention. (PUF at ¶ 46).

## III.   <u>PROCEDURAL HISTORY</u>

Evans filed the instant action on January 15, 2020, after receiving a Notice of Right to Sue from the EEOC. Her Complaint asserts three claims: (1) a race discrimination claim against both Defendants under Ohio Revised Code ("R.C.") § 4112.02 (Count I) (Compl., at ¶ 126-138); (2) a race discrimination claim under Title VII against Hillman only (Count II) (Id., at ¶ 139-151)

12

(collectively the "Race Claims"); and (3) a claim against Schaeper under R.C. 4112.02(J) for "Unlawful Aiding, Abetting, and Inciting of Discrimination" (Count III) (Id. at ¶ 152-157).

## IV.   LEGAL ARGUMENT

### A.   Summary Judgment Standard.

This Court is well versed in its standard of review under Fed. R. Civ. P. 56. Nevertheless, there are important aspects of the summary standard to underscore as the Court reviews the record evidence in this action. First, the Sixth Circuit has "repeatedly said that unsubstantiated, self-serving assertions will not preclude an adequately supported motion for summary judgment from being granted." *Mosquera v. MTI Retreading Co.*, 745 F. App'x 568, 573 (6th Cir. 2018) (citing several cases). Second, reliance on speculation and conjecture is not sufficient to survive summary judgment. *Chao v. Norse Dairy Sys.*, No. C-2-05-0826, 2007 U.S. Dist. LEXIS 71478, at *31 (S.D. Ohio Sep. 26, 2007). Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment. *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) (citing *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). Third, courts are not permitted to stack inference upon inference to preserve an issue for the jury. *Gregg v. Ohio Dep't of Youth Servs.*, 661 F. Supp. 2d 842, 859 (S.D. Ohio 2009).

### B.   Defendants Are Entitled to Summary Judgment on Evans' Race Claims Because Evans Cannot Show Pretext.

Evans alleges race discrimination under Title VII and R.C. § 4112. Title VII makes it unlawful for an employer "to discharge any individual" on the basis of race. 42 U.S.C. §§ 2000e-2(a)(1). Similarly, R.C. 4112.02(A) makes it unlawful for an employer "to discriminate against [any] person with respect to hire, tenure, terms, conditions, or privileges of employment, or any other matter directly or indirectly related to employment" on the basis of race. The Ohio Supreme Court explains that "federal case law interpreting Title VII . . . is generally applicable to cases

13

involving alleged violations of R.C. § 4112." *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 471-72 (6th Cir. 2005) (quoting *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128 (Ohio 1981)).

Where, as here, a plaintiff lacks direct evidence of discrimination, he or she must navigate the *McDonnell Douglas* burden-shifting framework by first establishing a *prima facie* case of discrimination and then, in response to the employer's proffered legitimate non-discriminatory reason, prove that such reason is pretext for unlawful discrimination. *Clay v. UPS,* 501 F.3d 695, 703 (6th Cir. 2007); *Braithwaite v. Timken Co.,* 258 F.3d 488, 493-94 (6th Cir. 2001); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255 (1981); *Woythal v. Tex-Tenn Corp.,* 112 F.3d 243, 246-47 (6th Cir. 1997). For purposes of summary judgment only, Defendants concede that Evans can establish a prima facie case of race discrimination. She is in a protected class based on race; there is at least a factual dispute as to whether she was qualified for the position sought and hired for; she suffered an adverse employment action through her termination of employment; and she was replaced with someone outside her protected class.

Defendants' reciprocal burden under *McDonnell-Douglas* is to demonstrate the existence of a legitimate, non-discriminatory reason for Evans' termination, which they have. Specifically, Defendants terminated Evans because she appeared disengaged and unhappy with her job. After three days of training, Schaeper observed Evans looking bored, on her phone, and not paying attention during meetings. Considering her demeanor, Hillman determined that Evans was not a good fit for the role. Terminating someone because they appear to exhibit this type of behavior is not discriminatory. Rather, Evans perceived disengagement and disinterest was an honest, legitimate, and nondiscriminatory reason for her termination. *See Jones v. Lowe's Cos.*, 845 Fed.

Appx. 205, 211 (4th Cir. 2021) (recognizing disengagement from job as a legitimate, non-discriminatory reason for termination in a race discrimination case).[4]

Having established a legitimate, non-discriminatory basis for terminating Evans' employment, Evans bears the ultimate burden of proving that such reason is pretext for discrimination. *See Newbill v. Sec'y, Dep't of the Treasury*, No. 1:17-cv-430, 2018 U.S. Dist. LEXIS 180406, *27 (S.D. Ohio Oct. 22, 2018) (Bowman, M.J.) ("The 'ultimate burden of proving…the intent to discriminate' remains with the plaintiff at all times.") (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006)), Report & Recommendation adopted by 2018 U.S. Dist. LEXIS 193452 (S.D. Ohio Nov. 13, 2018). A plaintiff can refute the legitimate, nondiscriminatory reason "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Wexler v. White's Fine Furniture*, 317 F.3d 564, 576-577 (6th Cir. 2003). When reviewing all the record evidence before the Court, there is no genuine dispute of material fact that calls into question Defendants' legitimate reason for Evans' termination of employment.

> ### i.   Evans Fails to Show Any Evidence of Racial Animosity.

Evans has nothing to support her contention that racial animus motivated Hillman's operations or its decision to terminate her employment. The only mentions of race in the record are made by Evans; it is purely her speculation and subjective feelings of racial discrimination. Rather, the record establishes that Hillman had consistent race-neutral expectations of its

---

[4] *See also Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 184 (6th Cir. 2004) (legitimate, non-discriminatory reason established where employer did not select candidate "because of his dislike of administrative duties, his apparent disinterest in clinical work, and his tendency to arrive late to meetings."); *McMullin v. T. Scott McRaven, D.M.D., P.C.*, 882 S.W.2d 772, 775 (Mo. App. 1994) ("a display of boredom and disinterest constitutes a legitimate business reason to terminate an employee.") (citing *Reed v. Famous Barr Division*, 518 F. Supp. 538, 541-42 (E.D. Mo. 1981). Even further, adverse personality traits as a whole provide a legitimate, non-discriminatory basis for termination. *See, e.g., Thompson v. Bd. of Educ.*, No. 3:12-cv-287, 2013 U.S. Dist. LEXIS 161175, at *18-19 (S.D. Ohio Nov. 12, 2013) (finding proffered reason that plaintiff was simply "not a good fit" was honest, legitimate, and non-discriminatory).

employees, which Evans failed to meet. There is nothing in the record that challenges the legitimacy of Defendants' race-neutral business judgment.

Evans' primary "evidence" in support of her claim that Defendants possessed discriminatory motive in terminating her employment is Schaeper's alleged use of the term "girl." However, her support for this theory is nothing more than personal opinion and conjecture. Notably, Evans agreed that the word "girl," by itself, has no connection to race. (Evans Dep. at 34:8-15 ) (Evans testifying she "believe[s the word] is used to refer to girls."). Rather, Evans suggests that it is the context and the way the word is used which could make it derogatory. (*Id*.). But Evans' entire basis for claiming that the alleged use of the term "girl" was a reference to her race is her own opinion. (Id. at 32:12-33:3, 50:3-52:5, 71:1-72:13). She offers no additional context that would elevate these otherwise harmless remarks to ones constituting circumstantial evidence of race discrimination. "Girl" is nothing more than an innocuous slang term used among women, similar to how males refer to each other as "man." (e.g., "Hey girl;" "Hey man"). All Evans offers is her subjective belief and speculation that the term must have been derogatory, which is insufficient to state a claim for discrimination. *Hillery v. Fifth Third Bank,* No. 2:08-cv-1045, 2009 U.S. Dist. LEXIS 39658, *5 (May 11, 2009).

Indeed, at her deposition, Evans admitted that if Schaeper testified that she was not referring to Evans' race in calling her "girl," she would have no evidence to refute that beyond her own personal opinion. (*See* PUF at ¶¶ 41-46). Fatal to Evans' race discrimination claims, Schaeper *did* testify, under oath, that if she used the term "girl," she intended it to be friendly. (*Id*. at ¶ 40). Schaeper explained that she often refers to friends, coworkers, and family as "girl" when she is trying to be welcoming. (*Id*.). Because Evans has nothing beyond her own speculation and

subjective feelings regarding contrived instances of racial animosity, the alleged use of the word "girl" does not undermine or otherwise refute the cited reasons for Evans' termination.

### ii. Evans' Belief that Her Termination Was Unfair and Her Disagreement with Schaeper's Perception Are Not Evidence of Pretext.

Evans' disagreement with Schaeper's perception of her work attitude is insufficient to create a plausible claim of race discrimination. This Court's only concern is if Schaeper's decision to terminate Evans was racially motivated. Evans merely disagreeing with Schaper's decision does not establish this fact, and Evans cannot establish pretext and overcome summary judgment by disagreeing with Defendants' records in this regard. "[T]he plaintiff must allege more than a dispute over the facts upon which his discharge was based. [Sh]e must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite,* 258 F.3d at 493-494 (6th Cir. 2001).

Here, Evans has not pointed to a shred of evidence aside from her own conjecture to support her allegation that her termination was racially motivated. She simply disagrees with Schaeper's perception of her as disengaged and disinterested in her job. But even if Evans was interested and engaged, that does not convert Schaeper's mistaken belief into a discriminatory one. Terminating someone because they give the impression of being bored and unhappy is not discriminatory, and certainly is not evidence of pretext. "When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) (citing *Clay*, 501 F.3d at 713-15).

### iii. Schaeper Was the Same Individual Who Hired and Fired Evans.

This Court should also apply the "same actor inference." "[I]n cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short

time span following the hiring, a strong inference exists that discrimination was not a determining factor for adverse action taken by the employer." *Zambetti v. Cuyahoga Cmty. College*, 314 F.3d 249, 261 (6th Cir. 2002) (quoting *Buhrmaster v. Overnite Trans. Co.*, 61 F.3d 461, 463 (6th Cir. 1995)). *See also Wofford v. Middletown Tube Works, Inc.*, 67 F. App'x 312, 318 (6th Cir. 2003) (strong evidence of no discrimination where same person hired plaintiff twice).

Admittedly, the same actor inference is not mandatory, and it can be weakened by the existence of other evidence suggesting discrimination. *Wexler* at 573-74; *Mischer v. Erie Metro Hous. Auth.*, 168 F. App'x 709 (6th Cir. 2006). However, the facts of this case are the type for which the same actor inference exists. Here, Schaeper was the same individual who ultimately decided to hire Evans and whose reported concerns were the basis for her termination. (PUF at ¶¶ 2-11, 34-38). Had Schaeper harbored any discriminatory animus toward Evans because of her race, she could have easily denied Evans the position. Indeed, she had interviewed at least six individuals total for the position, four of whom were not African American, (*Id*. at ¶ 3), and could have selected any of them over Evans. Instead, she did the opposite. After interviewing Evans **in person**, she immediately asked her supervisor and the HR Business Partner to forego traditional interview practices and make an offer on the spot. (*Id*. at ¶¶ 8-11).

Schaeper's interactions with Evans were also not limited to the interview process and termination conversation. She was also the individual responsible for training Evans and personally witnessed what she perceived as Evans' disengagement and disinterest in the role. (*Id*. at ¶¶ 14-32). Schaeper's goal was to inject energy and excitement into her department following a period of low morale, and as such Evans' outward demeanor gave her cause for concern. (*Id*. at ¶¶ 7, 17-32). And, when she identified her issues with Evans' body language to Evans, Evans became combative, disagreed with her, and then asked to leave, doing nothing to alleviate Schaeper's

already-existing concerns. (*Id.* at ¶¶ 27-32). These facts further undermine any argument that Schaeper's subsequent decision to terminate Evans was motivated by race. The fact that Schaeper was adamant about hiring an employee who was African American weighs heavily against any allegation that she terminated the same employee because of her race.

### iv. Evans and Her Predecessor Were Not Similarly Situated.

Evans may also argue that Hillman's decision to place her predecessor, a Caucasian male, on a performance improvement plan ("PIP"), whereas Evans was terminated without any prior progressive discipline, is evidence of discrimination. Such an argument is based on a single event occurring on Evans' first day of work, Monday July 15, 2019. During one of the training sessions Schaeper was facilitating with Evans on that day, the two discussed the job duties of the supply planner role and specifically the timeliness of submitting purchase orders and replying to orders. (*Id.* at ¶ 47). A former Hillman employee that Schaeper supervised for a period of three months had significant deficits in this area, such that he was placed on a PIP. During the training, Schaeper identified the PIP to underscore the importance of Evans' job tasks. While she showed Evans the document briefly, the two did not read through it or go over it together. (*Id.*). It was merely intended as a gesture. (*Id.*).

To the extent Evans claims that she received less favorable treatment than a similarly situated person outside her protected class as evidenced by this PIP, (*See* Compl., at ¶¶ 49-51), such argument also fails. Evans and her predecessor were more dissimilar than they were alike. Defendants admit that Evans' predecessor was given a PIP whereas Evans' employment was terminated after three days. However, the bases for their respective adverse employment actions differ greatly. Specifically, Evans' predecessor was given a PIP because he suffered from deficiencies relating to the performance of his job duties that were objective, measurable, and

19

curable. The PIP was designed to provide a path for improvement on these job tasks. Schaeper testified that, notwithstanding these performance deficits, Evans' predecessor was engaged in his job. (PUF at ¶ 48). By contrast, Schaeper opined that Evans' issues—which related to her attitude and disinterest in the position as a whole—would not improve. Schaeper offered Evans the opportunity to correct her understanding of Evans' disinterest but Evans failed to do so. (*Id*. at ¶ 28). Moreover, any probative effect that the perceived disparate nature of treatment between these individuals may have is further undermined by not only Evans' lack of evidence of discriminatory animus in all respects and the fact that Evans' entire case rests on her own personal perceptions and opinions, but also because Schaeper personally and specifically hired her knowing her race.

### C.   <u>Unlawful Aiding, Abetting, and Inciting of Discrimination (Count III).</u>

Evans also asserts a claim against Schaeper under R.C. 4112.02(J) for "Unlawful Aiding, Abetting, and Inciting of Discrimination." (Compl., at PageID #14). Relevant here, R.C. 4112.02(J)(1) makes it an unlawful discriminatory practice for any "person" to "aid, abet, incite, compel, or coerce the doing of any…unlawful discriminatory practice." In its Order on Defendants' Motion to Dismiss (Dkt. 16), the Court reasoned that Evans could state a claim for aiding and abetting *if* Schaeper assisted Hillman in discriminating against Evans, akin to "Cat's Paw" liability (Id. at PageID #114). But as the record evidence shows, Schaeper harbored no discriminatory animus toward Evans and was not motivated by her race to raise concerns to Cornett or anyone else at Hillman. Evans' aiding-and-abetting claim thus fails.

## V.   <u>CONCLUSION</u>

For all of the foregoing reasons, Defendants The Hillman Group, Inc. and Tia Schaeper respectfully request that the Court enter summary judgment in their favor on all claims asserted by Plaintiff Eran Evans, and the Court dismiss those claims with prejudice.

Respectfully submitted,

*/s/ Megan S. Glowacki*
Megan S. Glowacki (0086572)
Anthony P. McNamara (0093670)
THOMPSON HINE LLP
312 Walnut Street, Suite 1400
Cincinnati, Ohio 45202
Phone: (513) 352-6700
Fax: (513) 241-4771
Megan.Glowacki@ThompsonHine.com
Anthony.McNamara@ThompsonHine.com
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on December 21, 2021, I electronically filed the foregoing with the Clerk of

the Court using the electronic filing system, which will send notification of such filing to counsel

of record.

*/s/ Megan S. Glowacki*
Megan S. Glowacki

4880-3002-4710.5