**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION (CINCINNATI)**

| | | |
|---|---|---|
| ERAN EVANS, | ) | CASE NO. 1:20-cv-00041 |
| | ) | |
| Plaintiff, | ) | Magistrate Judge Stephanie K. Bowman |
| | ) | |
| v. | ) | |
| | ) | |
| THE HILLMAN GROUP, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

## I.     INTRODUCTION

Three days. It took Defendants, The Hillman Group, Inc. ("Hillman") and Tia Schaeper, only three days to decide Plaintiff Eran Evans – the only African American employee in an entirely Caucasian department – was not a good "cultural fit" for their all-White Supply Planning Department. Based entirely on her subjective opinion, speculation, and conjecture, Schaeper interpreted Evans' body language and demeanor as her being disengaged and unhappy with her job. She never actually asked Evans if she was happy or engaged until Evans' third and final day of employment; instead, Schaeper merely reached this conclusion because Evans "did not match the same body language, didn't exhibit the same expressions as other (Caucasian) members on the team." Doc. 28, p. 304. Schaeper's expectation of how Evans should look and act was based on her comparing Evans' appearance, demeanor, and attitude to all her Caucasian coworkers. *Id.* at 310-11, 314.

To make matters worse, just a couple months prior to Evans' arrival at Hillman, Schaeper supervised a Caucasian employee, Matt Baldwin, and tolerated the same behavior and attitude

1

from him for months without terminating his employment. After several discussions regarding his performance and attitude, Schaeper placed Baldwin on a Performance Improvement Plan ("PIP"), and yet, his performance still did not improve. Evans never got the opportunity to perform the functions of her job. Indeed, Schaeper had no clue how well Evans would do in the Supply Planner role; Defendants fired Evans before she got that chance. Schaeper tolerated the Caucasian employee's poor performance and unhappy, disengaged attitude for months. She coached him, held several meetings with him, and gave him the opportunity to improve under a PIP. For the African American employee, however, Schaeper never spoke with her about her alleged attitude, never tried to coach or counsel her, and recommended her termination after only three days.

When the Court applies all the facts in a light most favorable to Evans, summary judgment should be denied because Defendants have failed to meet their initial burden under Civ.R. 56(C), and genuine issues of material fact remain as to Evans' claim for race discrimination and Defendants' motives in terminating Evans' employment. As set forth below, Evans has presented evidence from which a jury could reasonably doubt Defendants' explanation and, if so, how strong it is. Thus, the Court should deny Defendants' Motion in its entirety.

## II.  STATEMENT OF FACTS[1]

In considering the factual allegations and evidence presented in a motion for summary judgment, "the evidence must be viewed in the light most favorable to the nonmoving party." *Wilson v. Brennan*, 213 F. Supp. 3d 934, 943–44 (S.D. Ohio 2016); *Giffin v. Provider Servs., Inc.*, No. 2:10-CV-144, 2011 WL 923380, at *5 (S.D. Ohio Mar. 15, 2011). Thus, taking the evidence in the light most favorable to Evans, the following is a recitation of the facts.

---

[1] All responses, disputed issues of material facts, and record citations contained in Evans' Responses to Proposed Undisputed Facts, filed contemporaneously with this Opposition, are incorporated by reference as if fully rewritten herein.

### A. Evans Was the Only African American Employee in Hillman's Supply Chain Department

Evans was employed as a Supply Planner by Hillman from July 15, 2019 to July 18, 2019. Doc. 27-1, p. 285.[2] During that time, Schaeper was the Supply Chain Manager and Evans' direct supervisor. Doc. 28, p. 290. Evans is African American; in her words, she is "Black, of African descent." Doc. 27, p. 169. Schaeper is Caucasian. Doc. 28, p. 289. Schaeper's boss, Jason Cornett, is Caucasian. *Id*. at 293. Mark Weber, Hillman's Human Resources Business Partner, is Caucasian. Doc. 29, p. 380.

In July 2019, Schaeper was one of three managers in the Supply Chain Department; Chelsea Whyte (Caucasian) and Terry Myrick (Caucasian) were the other two managers in the department. Doc. 28, pp. 290-91. Each of the three managers supervised roughly six employees. *Id*. at 291. Excluding Evans, every member of Schaeper's team was Caucasian: Justin Sullivan, Todd Federle, Amy League, Larry Ziegler, and Kaity Bowin. *Id*. at 292. In the entire Supply Chain Department in July 2019, Evans was the only African American employee. Doc. 29, p. 388.

### B. Evans Was Hired as a Supply Planner for Hillman

In May 2019, Schaeper and Whyte interviewed Evans for the Supply Planner position. Doc. 28, pp. 292-93. Ultimately, Schaeper made the decision to hire Evans. *Id*. at 293-94; Doc. 28-1, p. 320. As a Supply Planner, Evans would have been expected to support Hillman's supply chain operations through purchasing and coordinating the movement of raw materials and finished goods to ensure that production and sales expectations are met. *Id*. at 322. Nowhere in the job description for Supply Planner with Hillman does it require the employee to sit upright in their chair while working, smile throughout the day, shake hands of fellow coworkers, or exhibit a passion or happiness for supply chain management. *See id*.

---

[2] All citations to PageID will be abbreviated as "p."

Evans was qualified for the Supply Planner position with Hillman, but due to her very short time with the company, "she did not perform any functions of the job in the role." Doc. 28, p. 294. Indeed, Schaeper acknowledged, "[Evans] didn't have an opportunity to perform any ability – she didn't do any functions of the job and role." *Id*.

### C. Day One: Onboarding and Team Introductions – Evans "Not Engaged" Because She Did Not Shake Hands

July 15, 2019 was Evans' first day of employment with Hillman. That day, she met with Weber for approximately an hour and a half to complete new-hire, onboarding paperwork. Doc. 29, p. 383. Amy League (Caucasian) – another Supply Planner hired for Schaeper's team – also began her employment with Hillman that day, and she completed her new-hire paperwork with Evans. *Id*.[3] As far as personalities go, both Evans and League "were fine." *Id*. Weber "had no issues with either of them." *Id*. Indeed, Evans' demeanor and personality during her onboarding meeting with Weber was "very nice," and there was no real difference between how Evans interacted with Weber versus how League interacted with him. *Id*. at 383-84.

After her meeting with Weber, Evans met with Schaeper, who showed Evans around the office and introduced her to the other team members. Doc. 28, p. 306. Schaeper did not think Evans was "engaged with meeting her coworkers" because Evans was not "overtly friendly," "shaking their hands," or "asking them how long have [they] worked at Hillman." *Id*. Evans was not rude to anyone, but Schaeper thought Evans was not engaged because these are things Schaeper would have done when meeting new team members, so she expected Evans to act that way as well. *Id*. Nothing in the job description for Supply Planner or in Hillman's Employee Handbook requires new employees to be "overtly friendly," shake hands, or ask questions about their coworkers' employment history with the company. *Id*.; *see also* Doc. 28-1, pp. 322-369.

---

[3] League is still employed with Hillman. *Id*.

4

Schaeper agrees "we all have different body language," and everyone shows their excitement in different ways. Doc. 28, pp. 303-304. Schaeper knew Evans for only a couple hours at that point, and she acknowledged that she did not know whether Evans was an introvert or extrovert, or whether her reserved demeanor was due to first-day nerves. *Id*. at 306-307. That first day, Schaeper never mentioned anything to Evans about her demeanor, her body language, or about not appearing to be engaged. *Id*. at 306.

### D.  Day Two: Shadowing and Training

July 16, 2019 was Evans' second day of employment with Hillman. That day, Schaeper set Evans up with several training sessions and provided her training materials. *Id*. at 307-308. Evans never missed any of the training sessions, was never on her phone during those sessions, never rolled her eyes or said anything to make Schaeper believe she disliked the training, and as far as Schaeper knows, read all training materials provided to her. *Id*. at 300, 308. When Evans was at her desk working or reading through training materials, she exhibited the same demeanor and body language as the day before. *Id*. at 308. That second day, Schaeper never mentioned anything to Evans about her behavior or body language. *Id*.

### E.  Day Three: Team Meeting, More Training, Evans "Not Engaged" – Schaeper Wants to Terminate Evans' Employment

July 17, 2019 was Evans' third day of employment with Hillman. That day, Evans attended her first category health team meeting. *Id*. at 295. Cornett attended the meeting via telephone, Schaeper led the meeting, and each team member spoke about their own responsibilities and areas of concern. *Id*. Evans had no responsibilities to speak or otherwise participate in the meeting. *Id*. at 295-96. Schaeper never spoke directly to Evans during the meeting, nor did any team member speak to Evans or ask her any questions. *Id*. at 297. Indeed, Schaeper never set any expectations

for Evans regarding the meeting, had not yet assigned any categories or responsibilities to Evans, and did not expect Evans to follow-up on any of the agenda items from the meeting. *Id*. at 297-98.

During the meeting, Evans was on her cell phone. Schaeper did not know why Evans was on her phone during the meeting. *Id*. at 297. Schaeper assumed Evans "was not engaged" because she was on her phone, yet Schaeper admitted she does not know if Evans was able to listen to the meeting and look at her phone at the same time. *Id*. at 297-98. According to Hillman's "Personal Cellular Phones" policy,

> [T]he use of personal communication devices such as cellular phones and other mobile devices is restricted during work hours and in work areas…Excessive personal calls during the workday, regardless of the phone used, can interfere with employee productivity and be distracting to others…Flexibility will be provided in circumstances demanding immediate attention….

*See* Doc. 28-1, p. 356; Ex. A. Evans was on her phone during the team meeting because her son had been injured, and she was dealing with a situation that required her immediate attention. Doc. 27, p. 171. Evans told Schaeper this later that day, but neither during the meeting nor immediately following the meeting did Schaeper ask Evans about her cell phone usage or otherwise discuss her purported lack of engagement. Doc. 28, p. 308.

Although Schaeper had "fleeting observations" of Evans on her cell phone throughout the three days she worked for Hillman, Evans was not always on her phone, nor was she ever talking on her phone. *Id*. at 299. Evans' use of her cell phone did not cause her work performance to suffer, nor was she prevented from completing any tasks due to her being on the phone. *Id*. at 300. Indeed, Schaeper testified, "I don't think she had really been performing functions of the job at that point to have it interfere." *Id*.

Schaeper also did not think Evans was engaged in the team meeting that day because she never observed Evans taking any notes, yet she never actually asked Evans if she took notes, nor

6

did she ever look at Evans' computer to see if she took notes. *Id*. at 296, 298. In fact, Evans took notes all three days she was employed with Hillman. Doc. 27, p. 190.

Following that team meeting, Schaeper attended a "stretch of meetings" without Evans, so for approximately two hours, Evans sat at her desk alone, reading training materials. Doc. 28, p. 308. Towards the end of the day, Schaeper told Evans she wanted to go through another training module with her. The two worked through the training module at Schaeper's desk, sharing Schaeper's computer monitor. *Id*. at 308-309. Schaeper, however, refused to turn the screen so that Evans could easily see it. Doc. 27, p. 171.

After approximately 10 or 15 minutes of training, Schaeper "felt compelled to check in with [Evans] and ask, 'are you okay?'" because Evans was not "actively trying to squint at the screen," nor was she "nodding, asking questions, [or] taking notes." Doc. 28, p. 309. Evans was not looking around the cubicle (indicating she was not paying attention) nor was she on her phone. *Id*. Instead, Evans was leaned over to peer into Schaeper's computer screen with a look of serious intent to learn the process, nodded when Schaeper asked her if she understood, and tried to absorb the information so she could create notes. Doc. 27, p. 185.

Evans responded she was fine, and Schaeper told her she looked "bored." *Id*. Evans then stated, "Well, I'm just following along with you, reading the notes," to which Schaeper stated, "Yeah, but you don't look -- you know, your -- it's your face." Evans said, "Well, how is my face supposed to look?" Schaeper responded, "Well, you're supposed to look like you're happy to be here." *Id*. When Evans then stated, "Yeah, I am. I'm happy to be here," Schaeper "slammed down her pen and looked up to the ceiling as if she had had enough, and she said, 'this is your job.'" *Id*.

The conversation went back-and-forth in this regard for a while. Schaeper yelled at Evans and told her she needed to look happy. *Id*. at 186. Evans tried to explain to Schaeper she was

focused and determined and just trying to learn the new job and retain the information, while Schaeper repeatedly told Evans she did not look engaged and looked bored because of how Evans' face looked. *Id*. at 185-86. According to Evans, "[Schaeper] kept saying it was my face. My face, my face, my face, and that I needed to, you know, understand that it was my face." *Id*. at 187.

Finally, Schaeper asked Evans, "is this going to be a problem?" When Evans asked what she meant, Schaeper responded, "you not being happy here." *Id*. at 188. Evans said, "I'm happy here," and Schaeper then "sucks her teeth or something and kind of turns…to her laptop and just starts working." *Id*. After sitting in silence for several minutes, Evans asked if she could leave. *Id*. Schaeper just waved her hand and said, "yeah, you know." *Id*.

During this exchange, Evans asked Schaeper for specific examples of how she was giving off the impression she was not engaged. Doc. 28, p. 309. Schaeper mentioned Evans' lack of nodding and not asking questions, as well as her use of her cell phone during the team meeting that morning. *Id*. Schaeper made no mention of Evans using her cell phone on any other occasion during her three days with Hillman. *Id*. At that point – the first time Schaeper raised any concerns about Evans' cell phone usage – Evans explained she was dealing with an emergency involving her son. *Id*. Schaeper then said, "absolutely, if you had an issue with your son, I expect you to address it with your family." *Id*. At no point prior to this discussion had Schaeper ever raised any concerns to Evans about the use of her cell phone or about her demeanor, attitude, body language, or the way she appeared. *Id*. at 302, 318; Doc. 27, p. 188.

During this discussion, Schaeper claims Evans was "combative," yet Evans never stood up during the discussion, never exhibited physical aggression, never used profanity, and never made any threats. Doc. 28, p. 310. Evans supposedly raised her voice to Schaeper, yet nobody around

8

them in nearby cubicles heard their conversation. *Id*. It was actually Schaeper who yelled at Evans. Doc. 27, p. 186.

After Evans left, Schaeper immediately contacted Jason Cornett to discuss her concerns and to ask his advice on how to handle it. Doc. 28, p. 310. Cornett then called Kim Corbitt (Human Resources, Caucasian). *Id*. at 311. Cornett then called Schaeper back and told her, "The best course of action would be to part ways." *Id*. Cornett then sent an email to Mark Weber that read, "We think we have a problem with a new employee's **cultural fit** at Hillman. Based on 3 days experience, we think it's probably best to part ways before we get into a more challenging, complicated situation for the new employee and us." Doc. 28-1, p. 371 (**emphasis added**). Schaeper did not make the decision to terminate Evans' employment. Doc. 28, p. 311.

### F. Day Four: Evans Terminated – Not A Good "Cultural Fit" for Hillman; Evans Did Not Look or Act Like Her Caucasian Coworkers

July 18, 2019 was Evans' fourth and final day of employment with Hillman. That morning, Schaeper, Weber, and Cornett had a conference call "to get Mark up to speed" about Schaeper's concerns and to discuss Evans' termination. *Id*. Schaeper then called Evans into a meeting with her and Weber and terminated her employment. *Id*. at 312. During the meeting, Evans again asked for examples of how she seemed uninterested or disengaged in the job, and Schaeper again mentioned her cell phone usage during the team meeting the prior morning and her "lack of interest/questions during training." Doc. 28-1, p. 373.

Schaeper has never terminated anyone's employment after only three days. Doc. 28, p. 317. In that short period of time, Schaeper never gave Evans the chance to perform any functions of the Supply Planner position. *Id*. at 316. As acknowledged by Schaeper, "we were three days into training. It was very much at that point in time only a training environment." *Id*. Although Schaeper claims Hillman "really needed somebody who was going to be passionate about their job

and about being there and engaged and enthusiastic about supply chain," she admits she has no idea how Evans would have performed in her job. *Id*. Schaeper was extrapolating how Evans' career with Hillman would look based on only three days and "based on [Schaeper's] perception of [Evans'] cultural fit with Hillman." *Id*. Evans never told Schaeper she was unhappy or did not want to be at Hillman. *Id*. Instead, Schaeper's perception that Evans was unhappy and disengaged was "based on [her] expectation of how she should appear." *Id*. at 314.

Schaeper had only ever supervised one other African American employee in her professional career, so all her expectations for how employees should look and act were based on how Caucasian employees look and act. *Id*. at 301. Evans "did not match the same body language, didn't exhibit the same expressions as other (Caucasian) members on the team." *Id*. at 304. Schaeper's expectation of how Evans should look and act is based on her comparing Evans' appearance, demeanor, and attitude to all her Caucasian coworkers.

Schaeper knew nothing about Evans' personality during the three days she worked with her. *Id*. at 301. She did not know what type of learner Evans was. *Id*. Evans never gave Schaeper any indication she did not understand the training. *Id*. at 300. She never asked any questions to make Schaeper think she had not been listening. *Id*. at 301. She never made any mistakes to demonstrate she had not been paying attention or absorbing the training. *Id*. Indeed, other than Schaeper's perception that Evans was not "nodding, asking questions, taking notes," there was nothing to indicate Evans was not listening, paying attention, or absorbing the new material. *Id*.

"Every person is different." Doc. 29, p. 386. The way Schaeper might learn, her facial expressions, or her body language could be different than how Evans might learn or behave, but Schaeper never took that into consideration. *Id*. From day one, when Evans started with Hillman, until she was terminated four days later, Evans' demeanor, body language, and the way she

interacted with people never changed. Doc. 28, p. 307. Yet, Schaeper never accepted that was just Evans' natural personality or demeanor because "that's not how she was acting in the interview." *Id*. In other words, Schaeper was basing Evans' personality not on the three days Schaeper spent working with her, but on the 45 minutes she spent with Evans during the interview. *Id*.

Regarding the "culture" that Hillman was trying to create in the Supply Chain Department, they "wanted the employees to have fun at work" and "wanted [it] to be a family environment." Doc. 29, p. 387. Hillman started doing "departmental gatherings" and "department functions" "to bring the group better together," but there were no functions between July 15 and 18, 2019. *Id*. Eran never had the opportunity to participate in any kind of department function. *Id*.

During her four days with Hillman, Evans was never disciplined for performance, attendance, or any other reason. Doc. 29, p. 384.

### G.  Schaeper Never Referred to Evans by Her Name; She Repeatedly Referred to Evans as "Girl"

During Evans' short tenure with Hillman, Schaeper never referred to her by her name. Instead, she repeatedly referred to Evans as "girl" or "hey." Doc. 27, p. 170, 175. On Evans' first day with Hillman, as she got up to leave for lunch, Schaeper said to her, "where you going, girl?" *Id*. at 174-76. Evans "was bothered by it" and felt Schaeper's use of the word "girl" was "maybe to diminish me a bit just by the tone she used, and the fact that, again, this is not usually a phrase you use in professional settings." *Id*. at 175.

That same day, Schaeper was standing over Evans' shoulder while Evans was typing an email to another employee. *Id*. at 179. Evans accidentally misspelled Schaeper's name as "Tina" instead of "Tia", which caused "Tina Bolser" to pop up in the "to:" line. *Id*. Schaeper then said to Evans in a stern tone, "girl, what's wrong with you?" *Id*. In response, Evans said, "girl though?" trying to convey to Schaeper that she did not like being called "girl." *Id*. at 180.

11

On Evans' second day with Hillman, another employee, Todd, introduced himself to Evans and told her that he would have introduced himself sooner, but Evans and Schaeper always looked busy. *Id*. at 184-85. Schaeper, who was standing nearby, then patted Evans on the shoulder in a condescending way and said she had been "taking notes like a good little girl." *Id*.

### H. Matt Baldwin: Similarly Situated Caucasian Employee Who Engaged in the Same Behavior as Evans but Was Not Terminated

Shortly before Evans' employment with Hillman, Schaeper also supervised a Caucasian Supply Planner named Matt Baldwin. Doc. 28, p. 292. Baldwin was employed with Hillman from February 5, 2018 to May 3, 2019. *Id*. at 317. Baldwin exhibited performance issues while employed with Hillman to the point that Schaeper placed him on a PIP. *Id*. at 292.

Schaeper took over as Baldwin's manager in January or February of 2019, placed him on the PIP in March, and his performance never improved. *Id*. at 317-18. Indeed, Baldwin was not meeting "many things listed on the job description"; he did not sit upright in his chair when working, he did not meet "a lot of personal metrics" for his position, and he did not exhibit a passion and a sense of happiness for being at Hillman. *Id*. at 317. Despite exhibiting these performance issues for months under Schaeper's supervision, despite several conversations between Schaeper and Baldwin regarding his performance, and despite being placed on a PIP, Schaeper did not terminate his employment. *Id*. at 292. It was not even a situation where Baldwin was given the choice to resign in lieu of termination; he just voluntarily left Hillman. *Id*.

### III. SUMMARY JUDGMENT STANDARD

This matter is before the court on the Defendants' Motion for Summary Judgment. "The procedure for granting summary judgment is found in Fed.R.Civ.P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

12

The evidence must be viewed in the light most favorable to the nonmoving party." *Weems v. City of Columbus, Ohio*, No. 2:05-CV-87, 2006 WL 2640636, at *2 (S.D. Ohio Sept. 13, 2006) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)). "Summary judgment will not lie if the dispute about a material fact is genuine, 'that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.*, quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "After the parties have presented their evidence, 'the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Peters v. DCL Med. Labs. LLC*, 305 F. Supp. 3d 799, 813–14 (S.D. Ohio 2018) (quoting *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009)).

The Ohio Supreme Court has repeatedly made clear that because a grant of summary judgment denies the non-moving party the right to try his or her claims to a jury, such motions must be viewed cautiously and sparingly allowed, with all doubts resolved against the movant. *Norris v. Ohio Std. Oil Co.*, 70 Ohio St.2d 1, 2 (1982); *Osborne v. Lyles*, 63 Ohio St.3d 326, 333 (1992); *see also Shaw v. Central Oil Asphalt Corp.*, 5 Ohio App.3d 42, 44 (1981). In this regard, the Supreme Court has further held that Civ.R. 56 is an "extraordinary" procedure that "represents a shortcut through the normal litigation process." *AAAA Ents., Inc. v. River Place Comm. Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). Thus, the Supreme Court has mandated that the "requirements of the rule must be strictly enforced." *Murphy v. City of Reynoldsburg, et al.*, 65 Ohio St.3d 356, 360, 1992-Ohio-95. Indeed, "summary judgment must be used with extreme caution since it operates to deny a litigant his day in court." *Finch v. Xavier Univ.*, 689 F. Supp. 2d 955, 961 (S.D. Ohio 2010) (citing *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir.)).

**IV.**    **DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S RACE DISCRIMINATION CLAIMS (COUNTS I & II)**

In Counts I and II, Evans alleged race discrimination in violation of Ohio R.C. § 4112 and Title VII of the Civil Rights Act of 1964 ("Title VII"), respectively.[4] Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Similarly, Ohio law forbids an employer "to discharge without just cause, to refuse to hire, or otherwise to discriminate against [a] person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Ohio Rev. Code § 4112.02(A).

A plaintiff pursuing race discrimination claims under Title VII and Ohio Revised Code § 4112.02 may prevail in one of two ways: by presenting either direct or indirect evidence to prove that his or her employer was motivated by a race-based animus when it took an adverse employment action against the plaintiff. *Jones v. Kilbourne Med. Labs*., 162 F. Supp. 2d 813, 824 (S.D. Ohio 2000). "Outright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence." *Holbrook v. LexisNexis*, 2006-Ohio-5762, ¶ 22, 169 Ohio App. 3d 345, 351, 862 N.E.2d 892, 896 (quoting *Hunt v. Cromartie* (1999), 526 U.S. 541, 553, 119 S.Ct. 1545, 143 L.Ed.2d 731). Consequently, the necessary intent may also be proved circumstantially, employing the four-prong *prima facie* test in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668. *Id*.

---

[4] In analyzing employment discrimination and retaliation claims brought under Ohio R.C. § 4112, the Court utilizes the same analytical framework applied to claims under Title VII. *Allen v. Ohio Dep't of Job & Family Servs*., 697 F. Supp. 2d 854, 880 (S.D. Ohio 2010).

### A. Schaeper's Repeated Use of the Word "Girl" When Addressing Evans is Direct Evidence of Discrimination

During Evans' three days with Hillman, Schaeper never addressed her by her name. Instead, Schaeper repeatedly called her "girl" or "hey." As this Court has recognized, "the Supreme Court has held the use of the word 'boy' to refer to African-American male plaintiffs has racial undertones that may be evidence of an employer's racial animus, 'depend[ing] on various factors including context, inflection, tone of voice, local custom, and historical usage.'" Doc. 16, p. 109-10, quoting *Ash v. Tyson Foods, Inc*., 546 U.S. 454, 456 (2006). "Therefore, it is plausible the same factors could support a finding of racial animus where a Caucasian supervisor refers to her older, African-American employee as 'girl.'" *Id. Accord: Strickland v. City of Detroit*, 995 F.3d 495, 504 (6th Cir. 2021) ("Although not explicitly racial, a white officer referring to an adult African American colleague as 'boy,' without 'modifiers or qualifications' can qualify as evidence of impermissible racial bias."); *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 (6th Cir. 2008) ("some of the conduct was, on its face, clearly racially motivated—such as the continued use of the terms 'boy,' 'hey boy,' 'damn it boy,' and variations thereof").

Schaeper's repeated use of the word "girl" towards Evans was demeaning, offensive, and racially motivated. Doc. 27, p. 175, 184. It was unprofessional in the context of a work environment for Schaeper to call her older, African American subordinate "girl." The inflection and tone of Schaeper's voice when calling Evans "girl" expressed a tone of authority and condescension towards Evans, not a tone of friendliness. *Id*. at 175. Schaeper testified she often calls her friends, family, and coworkers "girl," but Evans was neither Schaeper's friend nor family member, and in the three days Evans worked with Schaeper, she never heard Schaeper refer to any of the Caucasian women on the team as "girl." *Id*. at 171. As a new employee, Evans did not want to offend Schaeper or cause any friction between the two, so Evans tried to let Schaeper know she

did not appreciate being called "girl" by saying to her, "girl though?" *Id.* at 180. This was Evans'
polite way of telling Schaeper she did not appreciate being called "girl," but clearly, the message
was not received, as Schaeper continued using that word to refer to Evans.

### B. Defendants Do Not Dispute Plaintiff Can Establish a *Prima Facie* Case of Employment Discrimination Based on Race

In the event this Court does not view Schaeper's repeated use of the word "girl" as direct
evidence of racial animus towards Evans, Evans can still prove the necessary racial intent
circumstantially, by meeting the four-prong *prima facie* test in *McDonnell Douglas.* To establish
a *prima facie* case of employment discrimination based on race, Evans must present evidence
demonstrating the following elements: 1) she is a member of a protected class; 2) she suffered an
adverse employment action; 3) she was qualified for her position with Hillman; and 4) she was
either replaced by an individual outside the protected class or she was treated less favorably than
a similarly-situated individual outside the protected class. *Allen,* 697 F. Supp. 2d at 881 (citing *St.
Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).
*Accord*: *Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir.1992); *Clayton v. Meijer, Inc*.,
281 F.3d 605, 610 (6th Cir.2002).

Here, Defendants concede that Evans can establish a *prima facie* case of race
discrimination. Doc. 30, p. 463. "She is in a protected class based on race; there is at least a factual
dispute as to whether she was qualified for the position sought and hired for; she suffered an
adverse employment action through her termination of employment; and she was replaced with
someone outside her protected class." *Id.*

It is also important to note that Evans was treated less favorably than Matt Baldwin, a
similarly situated individual outside her protected class. Baldwin was <u>not</u> engaged in his job, did
not meet "many things listed on the job description," did not sit upright in his chair when working,

16

did not meet "a lot of personal metrics" for his position, and did not exhibit a passion and a sense of happiness for being at Hillman. Doc. 28, p. 317. While Evans was purportedly terminated for exhibiting this same behavior after only three days, Defendants tolerated Baldwin's attitude, lack of passion and engagement, and performance problems for months. *Id*. at 317-18. And even then, Baldwin was not terminated; he voluntarily resigned from Hillman. *Id*. at 292.

### C. Defendants Cannot Articulate a Legitimate, Non-Discriminatory Reason for Plaintiff's Termination

According to the Sixth Circuit Court of Appeals, establishing these *prima facie* elements "creates a mandatory inference that the employer intentionally discriminated" against the employee. *Merendo v. Ohio Gastroenterology Grp., Inc.*, No. 2:17-CV-817, 2019 WL 955132, at *11 (S.D. Ohio Feb. 27, 2019) (citing *Monette v. Electronic Data System Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996)). Because Evans has established her *prima facie* case, the burden then shifts to Defendants to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Goetz v. City of Forest Park*, No. 11-CV-270, 2012 WL 4009512, at *10 (S.D. Ohio Sept. 12, 2012). Here, Defendants claim Evans was terminated "because she appeared disengaged and unhappy with her job." Doc. 30, p. 463. First, there is a genuine question of fact as to whether this was true, and second, even if true, this is not a legitimate basis to terminate employment.

Defendants maintain, "Terminating someone because they appear to exhibit this type of behavior is not discriminatory." *Id*. However, they rely primarily on *Jones v. Lowe's Cos.*, 845 Fed. Appx. 205, 211 (4th Cir. 2021), which is both non-binding on this Court and distinguishable from the present action.

In *Jones*, an action based on racial discrimination in violation of § 1981 and North Carolina law, Michael Jones worked for Lowe's for nearly four years, and during that time, exhibited strong performance in his roles as Chief Merchandising Officer and then Chief Customer Officer. *Id*. at

207. In fact, for much of his time with the company, Jones was one of two candidates to potentially succeed Robert Niblock as CEO. *Id*. Over time, though, Jones became "disengaged" and "not fully committed to the company." *Id*. at 209. Jones felt there was racial animus between him and Niblock, and in 2015-2016, an outside consultant group compiled performance reviews on executive leaders. *Id*. Their report included some poor "leadership scores" for Jones from Niblock. *Id*. at 210. Based on the perceived tension and poor performance scores, Jones chose to resign when he removed his personal items from his office, repeatedly asked to be severed with a package, and disengaged from his role as one of Lowe's top executives. *Id*. at 211-212. Indeed, "The court pointed to testimony from CEO Niblock and a member of the Board of Directors showing repeated and ongoing discussions about Jones' disengagement from his job, and to undisputed evidence that CEO Niblock had expressed his concerns personally to Jones. *Id*. at 212.

In the present action, Evans never exhibited <u>any</u> signs or indication she wanted to resign or that she was unhappy with her position at Hillman, and until Evans' third day with Hillman, Schaeper never addressed her purported lack of engagement. Evans never told Schaeper she was unhappy or did not want to be at Hillman. She did not pack up her cubicle or demand a severance package. She never complained to Schaeper or anyone else at Hillman about her job or her duties. She never even had the chance to demonstrate any performance issues, as Schaeper never assigned Evans any tasks aside from reading training materials at her desk. Instead, in just three short days, Schaeper somehow determined Evans was "disengaged and unhappy with her job" based solely on Schaeper's subjective opinion, speculation, and conjecture of Evans' body language, demeanor, and facial expressions as they compared to how Schaeper (and the other White members of her team) would look and act.

18

Defendants' contention that Evans "appeared disengaged and unhappy with her job" is not a legitimate, nondiscriminatory reason for terminating Evans' employment. According to Schaeper, Evans "did not match the same body language, didn't exhibit the same expressions as other (Caucasian) members on the team." *Id*. at 304. Unlike *Jones*, Evans never made any comments or took overt, objective actions to indicate she was disengaged or unhappy with her job. Schaeper's perception that Evans was unhappy and disengaged was "based on [her] expectation of how she should appear." *Id*. at 310-11, 314. It was Defendants' reliance on Schaeper's personal opinion, speculation, and conjecture that served as an illegitimate basis for Evans' termination.

### D. Defendants' Reason for Plaintiff's Termination is Pretext

In the event this Court determines Defendants' basis for terminating Evans' employment is a legitimate, nondiscriminatory reason, there remain genuine questions of fact as to Defendants' motivation in making that decision.

Once the employer states a nondiscriminatory reason for the action, the burden shifts back to Evans to demonstrate by a preponderance of the evidence that the reason articulated by Defendant was mere pretext. *Goetz*, 2012 WL 4009512 at *10. To demonstrate pretext, Evans must produce "sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him." *Id.* at *11 (quoting *Johnson v. Kroger Co*., 319 F.3d 858, 866 (6th Cir.2003)). "As 'an employer's true motivations are particularly difficult to ascertain' from the paper record, discrimination disputes are often 'unsuitable for disposition at the summary judgment stage' once the plaintiff has made out a prima facie case." *Goetz*, 2012 WL 4009512 at *11 (quoting *Singfield v. Akron Metro. Hous. Auth*., 389 F.3d 555, 564 (6th Cir.2004)).

Evans may prove pretext by showing: (1) Defendants' proffered reason had no basis in fact, (2) the proffered reason did not actually motivate the adverse action, or (3) the proffered

reason was insufficient to motivate the adverse action. *Id.*, citing *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir.1994). "To demonstrate pretext under the first method, the plaintiff must demonstrate that the proffered reason for his termination is 'factually false.'" *Barker v. PACCAR, Inc. d/b/a Kenworth*, No. 2:18-CV-338, 2019 WL 4040533, at *11 (S.D. Ohio Aug. 27, 2019) (quoting *Dukes v. Associated Materials, L.L.C.*, No. 27091, 2014-Ohio-4322, at ¶ 21 (Ohio App. Sept. 30, 2014)). A plaintiff can show pretext under the third method by demonstrating "that similarly situated employees were treated differently." *Id.* Here, Evans can establish pretext under the first and third methods.

### i. Genuine questions of fact remain as to whether Defendants' proffered reason is based in fact

Genuine questions of fact remain as to whether Evans was "disengaged and unhappy with her job." Schaeper purportedly believed this to be true because Evans "was not taking notes, not nodding her head that she understands, [and] not asking questions." *See* Doc. 28, p. 300. In the light most favorable to Evans, though, she took notes on her computer during her three days of training at Hillman. Doc. 27, p. 190. In fact, when Schaeper accused Evans of not taking notes during the termination meeting on July 18, 2019, Evans challenged that claim, stating, "you actually have commented on how well I've taken notes." *Id.* Schaeper then recanted and said, "Well, I'm not saying you didn't take any notes." *Id.* Further, during training sessions with Schaeper, Evans would lean over to see Schaeper's computer screen with a look of serious intent to learn the process, nodded when Schaeper asked her if she understood, and tried to absorb the information so she could create notes. *Id.* at 185.

When viewed in the proper light, there remain genuine questions of fact as to whether Evans was actually disengaged, unhappy, taking notes, asking questions, nodding her head, etc. Rather, Schaeper's own testimony supports the argument that her perception of Evans'

engagement and happiness with her job was because Evans "did not match the same body language, didn't exhibit the same expressions as other (Caucasian) members on the team." Doc. 28, p. 304. Schaeper's expectations of how Evans should look and act were based on her comparing Evans' appearance, demeanor, and attitude to all her coworkers, all of whom were Caucasian. *Id.* at 310-11, 314. Schaeper repeatedly told Evans she did not look engaged and looked bored because of how Evans' face looked. Doc. 27, pp. 185-86. "[Schaeper] kept saying it was my face. My face, my face, my face, and that I needed to, you know, understand that it was my face." *Id.* at 187.

Because material questions of fact exist as to Defendants' motive in terminating Evans' employment, and Evans has presented evidence from which a jury could reasonably doubt whether Evans was "disengaged and unhappy with her job," the Court must deny summary judgment.

### ii. Defendants' proffered reason was insufficient to motivate Evans' termination

Evans can also prove pretext by demonstrating "that similarly situated employees were treated differently." *Barker*, 2019 WL 4040533 at *11. "A plaintiff may offer evidence of similarly situated coworkers who were treated more favorably to raise a genuine issue of fact that the defendant's proffered reasons did not actually motivate its actions." *Merendo*, 2019 WL 955132 at *12. There is no dispute that a similarly situated Caucasian employee, Matt Baldwin, was treated differently than Evans. This, alone, is sufficient to prove pretext and preclude summary judgment.

As this Court has held, "To support a finding of disparate treatment, the Sixth Circuit has determined that the plaintiff and the other employees in question be similar in 'all relevant aspects.'" Doc. 16, p. 110, quoting *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008). "This means that the two employees 'must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id.*, quoting *Mitchell*, 964 F.2d at 583.

21

Here, it is undisputed that shortly before Evans' employment with Hillman, Schaeper supervised a Caucasian Supply Planner named Matt Baldwin. Baldwin was employed with Hillman for more than a year, from February 5, 2018 to May 3, 2019. As a Supply Planner, Baldwin reported to Schaeper and was held to the same standards as Evans. Baldwin, however, exhibited performance issues while employed with Hillman to the point that Schaeper placed him on a PIP. According to Schaeper, Baldwin was not meeting "many things listed on the job description," he did not sit upright in his chair when working (something Schaeper accused Evans of doing), and he did not meet "a lot of personal metrics" for his position (Evans never had the chance to meet any metrics). Doc. 28, p. 317. Most importantly, Baldwin was not engaged in his job; Schaeper expressly testified "he didn't" exhibit a passion and a sense of happiness for being at Hillman. *Id*. Only when Schaeper met with Baldwin to discuss his performance issues did he seem engaged, but following those meetings – and for two or three months while on the PIP – Baldwin's performance and attitude did not improve. *Id*. at 318.

For purportedly engaging in similar – though arguably much less serious – behavior, Evans was terminated after only three days. Schaeper, however, tolerated Baldwin's poor performance and unhappiness for months, and even then, he was not terminated; he voluntarily resigned. Schaeper met with Baldwin on numerous occasions about his performance and his attitude, and even placed him on a PIP to allow him the opportunity to improve (which he did not), yet she tolerated Evans' perceived unhappiness for only three days before recommending her termination. The only difference between Baldwin and Evans is race.

Because material questions of fact exist as to whether Evans was treated differently than a non-protected employee, Evans has presented evidence from which a jury could reasonably doubt Defendants' motives for termination. As such, the Court must deny summary judgment.

## V.     THE "SAME ACTOR INFERENCE" DOES NOT APPLY IN THIS CASE

In their Motion, Defendants argue "this Court should also apply the 'same actor inference'" because "Schaeper was the same individual who ultimately decided to hire Evans and whose reported concerns were the basis for her termination." Doc. 30, pp. 466-67. Defendants acknowledge, however, that this non-mandatory inference applies "in cases where the hirer and the firer are the same individual." *Id*. at 466, citing *Zambetti v. Cuyahoga Cmty. College*, 314 F.3d 249, 261 (6th Cir. 2002). That is not the case here. Schaeper expressly testified she did not make the decision to terminate Evans' employment. Doc. 28, p. 311. Thus, "the hirer and the firer" are <u>not</u> the same individual.

Regardless, as Defendants note, the same actor inference is not mandatory, and it can be weakened by the existence of other evidence suggesting discrimination. Doc. 30, p. 467 (citing *Wexler* at 573-74; *Mischer v. Erie MetroHous. Auth.*, 168 F. App'x 709 (6th Cir. 2006)). As set forth above, "other evidence suggesting discrimination" exists here. Schaeper interviewed and hired Evans, but after Evans failed to exhibit the same personality traits as the Caucasian employees on Schaeper's team, Schaeper – apparently suffering from buyer's remorse – recommended that Evans be terminated. Further, Schaeper tolerated poor performance, disengagement, and unhappiness from a Caucasian Supply Planner for months, but somehow decided Evans was not a good "cultural fit" for Hillman after only three days.

## VI.     CONCLUSION

Defendants terminated Evans' employment after three days, based entirely on Schaeper's subjective opinion, speculation, and conjecture. Evans did not look or act like her Caucasian coworkers, and as such, was deemed to be "disengaged and unhappy with her job."

Based on the disputed material facts above, genuine questions of fact remain as to Defendants' motives and whether they have established a nondiscriminatory cause for Plaintiff's termination. As such, Defendants' Motion for Summary Judgment in Counts I and II must be overruled.

Respectfully submitted,

*/s/Matthew G. Bruce*
Matthew G. Bruce (0083769)
Trial Attorney
**THE SPITZ LAW FIRM, LLC**
Spectrum Office Tower
11260 Chester Road, Suite 825
Cincinnati, OH 45246
Phone: (216) 291-4744
Email: Matthew.Bruce@SpitzLawFirm.com

*Attorneys for Plaintiff Eran Evans*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 21st day of February 2022, Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment has been filed via the Court's electronic filing system. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system, and parties may access the document through the Court's electronic filing system.

*/s/ Matthew G. Bruce*
Matthew G. Bruce (0083769)
**THE SPITZ LAW FIRM, LLC**