UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ERAN EVANS,

      Plaintiff,                             Case No. 1:20-cv-41

vs.

                                         Magistrate Judge Bowman

THE HILLMAN GROUP, INC.

      Defendant.

**MEMORANDUM OF OPINION AND DECISION**

Plaintiff Eran Evans brings this action through counsel against Defendants The Hillman Group, Inc. ("Hillman") and Tia Schaeper (collectively "Defendants") alleging that Defendants discriminated against her in violation Ohio Revised Code § 4112.02(a) ("Unlawful Discriminatory Practices") (Count I), Title VII of the Civil Rights Act of 1964 (Count II), and Ohio Revised Code § 4112.02(j) ("Unlawful Aiding, Abetting, and Inciting of Discrimination") (Count III). This matter is now before the Court on the Defendants' motion for summary judgment (Doc. 30); Defendants' proposed undisputed facts with supporting depositions and attachments (Doc. 30, Ex. 1); Plaintiff's memorandum and supporting attachments, including her response to Defendants' undisputed facts (Docs. 36, 37), as well as Defendants' reply memorandum. (Doc. 38).

The parties' have consented to disposition of this matter by the magistrate judge. 28 U.S.C. § 636(b)(1)(B).  (Doc. 19).

**I. Background and Facts**

Eran Evans, an African American female, applied online in May 2019 for an open supply chain planner role with Hillman. (Doc. 30, Ex. 1, at ¶ 1, Defs.' Proposed Undisputed Facts ("PUF"); see also Doc. 36, Plaintiff's response to PUF).  Tia Schaeper, a Caucasian

1

female Supply Chain Manager at Hillman, reviewed Evans' credentials and scheduled her for an in-person interview. (Id. at ¶¶ 2-3). Schaeper and another Hillman manager[1] interviewed Evans on June 12, 2019. (Id. at ¶ 4, See also Doc. 36, ¶4). The interview occurred in person, and Schaeper knew Evans was African American when interviewing her. (Id. at ¶ 5). During the almost forty-minute interview, Schaeper perceived Evans as passionate and enthusiastic about the role. (Id. at ¶ 6). Based on these expressions and her responses to Schaeper's situational and technical questions and her observed behavior during the in-person interview, Schaeper believed Evans would be a good fit for the position and team culture. (Id. at ¶ 7). Schaeper believed that such personality traits were crucial for a new hire to possess given that her department had recently experienced a number of departures. (Id.).

Schaeper then emailed Hillman Human Resources Business Partner Mark Weber after Evans' in-person interview and asked Weber and her direct manager, who at the time was Jason Cornett, to make an employment offer to Evans. (Id. at ¶ 8). A candidate would typically undergo a second-level interview with Cornett, but he was not immediately available to speak with Evans. (Id. at ¶ 9). But because Schaeper felt so confident about Evans based on her interview, Schaeper asked that Cornett trust her judgment so that Evans could forego that second interview and receive an offer sooner. (Id. at ¶ 10). Cornett agreed and based upon Schaeper's endorsement; Weber extended an offer of employment to Evans the same day she interviewed – June 12, 2019. (Id. at ¶ 11; but see Doc. 36, ¶11).[2]

---

[1] Plaintiff states that there were a total of 3 Hillman representatives at the interview. See Doc. 36, ¶4.
[2] Plaintiff disputes that the interview took place on June 12th and argues that it may have taken place in May. See Doc. 36, ¶11. Regardless, it is not a material fact.

Evans commenced work with Hillman on July 15, 2019. (Id. at ¶ 12). When she arrived, she met with Weber to sign basic onboarding documents. (Id. at ¶ 13). Weber also directed Evans to the location of Hillman's Employee Handbook and other policies on Hillman's intranet portal. (Id.). After this onboarding, Evans met with Schaeper for substantive training. (Id. at ¶ 14). Evans' first week of work was scheduled to primarily consist of trainings and shadowing Schaeper. (Id. at ¶ 15). On that Monday, July 15, the first day of work, Evans primarily shadowed Schaeper and learned organizational matters. (Id. at ¶ 16). Schaeper also walked Evans around to introduce her to coworkers during which Schaeper did not believe Evans appeared engaged or interested in interacting. She was not shaking hands, asking questions, or otherwise engaging in conversation. (Id. at ¶¶ 16-17). Instead, Schaeper perceived her as being distant toward her coworkers. (Id. at ¶ 17). Evans disagrees with Schaeper's perception of her. (Doc. 36, ¶17). The remainder of the day involved Schaeper training Evans on the reports she would pull as part of her normal job duties. (Id. at ¶ 18). Schaeper testified that Evans' work in her first week was primarily to read over the training materials provided and attend training meetings. (Id. at ¶ 15).

On July 17, 2019, Evans' third full day of work, Evans and Schaeper attended a "category health meeting" with the rest of the supply chain team. (Id. at ¶ 22). This was the first team meeting that Evans attended as a Hillman employee. (Id.). Before the meeting, Schaeper told Evans that it was an important meeting because Evans would be working on certain product categories and would be following up on those categories. (Id. at ¶ 23). During the meeting, however, Schaeper observed Evans texting on her phone and appearing disengaged. (Id. at ¶ 24). Schaeper also did not observe Evans take any

notes during the meeting. (Id.). This was concerning to Schaeper because these meetings contained "an abundant amount of information pertaining to several categories at a brand-new job that I would not expect anyone on their third day to retain or memorize," and Schaeper would have expected Evans—a new employee learning a new job—to be taking notes during her first team meeting. (Id. at ¶ 25 (quoting Schaeper Dep. at 34:22-25)). Evans' use of her phone was also of concern to Schaeper as she had witnessed Evans on her phone during each of the first three days of her orientation. (Id. at ¶ 20). Schaeper did not address the matter with Evans initially. (Id. at ¶ 25). Nevertheless, Schaeper moved forward with the training. (Id. at ¶ 27).

While working on a training program at Evan's desk, Schaeper checked with Evans to ask if she was okay. (Id. at ¶ 28). Her intent in doing so was to "giv[e] her [Evans] an opportunity to say…yeah, of course I'm okay or this is how I learn or I don't feel well or I'm having a bad day or anything." (Id. (quoting Schaeper Dep. at 86:18-24)). Evans responded to Schaeper's question with "mmm-hmm or yes". (Schaeper Dep. at 86:25). Schaeper told Evans that she was "giving off the impression that you're not interested in our trainings" and that she looked bored and unhappy. (Doc.30 at ¶ 29; Doc. 27 at p. 74-76).

Schaeper told Evans that she "kn[ew] it sounds silly, but this is your job so I want to make sure you're engaged with your job." (Id.). Evans replied by asking Schaeper to tell her how she was not engaged with her job, and Schaeper cited having "observed her on her phone, not asking questions, not nodding, all that." (Id.). Evans responded to Schaeper by explaining the reason for being on her phone during the earlier category health meeting. Namely, she was texting with her son because she learned he may have

gotten hurt and was checking on him. (Id. at ¶ 30). Schaeper responded, "absolutely, if you had an issue with your son, I expect you to address it with your family. I didn't know that. All I could see in the moment was that you were present in this important meeting that pertains to your job, and you were on your phone the whole time." (Id. at ¶ 31 (quoting Schaeper Dep. at 87:17- 23).  Evans states that she did take notes and that Schaeper even commented on the amount of notes that Evans had taken. (See Doc. 27, Evans Depo., p93-94, PAGEID 190).  After some additional back-and-forth, Evans asked if she could leave, and Schaeper said yes.  (PUF at ¶ 32; Schaeper Dep. at 87:24-88:52).

After Evans left, Schaeper called her supervisor, Jason Cornett, to ask for advice on how to handle Evans' behavior. (PUF at ¶ 33). Schaeper explained to Cornett that she believed that her last interaction with Evans was inappropriate and unprofessional and that she had "observed many instances of her not being engaged with the role, with the job, with her training, and that [she] was worried that this [Evans' employment] was not a great fit for somebody that we were looking for to build a culture of someone excited about supply chain and hopefully turning around the department morale." (Id. at ¶ 34 (quoting Schaeper Dep. at 91:11-18)).

Schaeper gave Cornett the same examples of Evans' disengagement and unprofessionalism that she had given to Evans just a few moments earlier. (PUF at ¶ 34). Schaeper did not indicate to Cornett that she wanted to terminate Evan's employment. (Id.). Cornett told Schaeper that he would call Kim Corbitt, Hillman's then-Chief Human Resources Officer, and then ended the call. (Id. at ¶ 35). He then told Schaeper that, after speaking with Corbitt about the matter, the two had decided "that the best course of action would be to part ways [with Evans] and not further any more time and training into

5

somebody who wasn't wanting to be there." (Id. (quoting Schaeper Dep. at 93:22-25)).

The next morning, July 18, 2019, Schaeper, Cornett, and Weber discussed Schaeper's observations and perceptions of Evans and Cornett's conversation with Corbitt. (PUF at ¶ 36). Schaeper explained to Weber that, after three days of training and work, she perceived that Evans generally appeared distracted, disinterested, and disengaged. (Id.). Cornett informed Weber that, based upon Schaeper's observations, Corbitt decided to terminate Evans before investing in her further. (Id.). Following that discussion and shortly after Evans arrived for work, Schaeper and Weber met with Evans to notify her of the decision. (Id. at ¶ 37). Schaeper repeated to Evans that Hillman was trying to foster a culture of enthusiasm and passion about supply chain, as well as her observation that Evans consistently appeared disengaged and unhappy with her job, and that Evans' demeanor—after only three days of work—led Schaeper to believe that Evans was not suited for the team and the culture she was attempting to foster. (Id.). Evans asked for examples, which Schaeper again provided. (Id. at ¶ 38). Schaeper then left the room, and Evans told Weber that she felt her termination was discriminatory. (Id. at ¶ 39).

During Evans' short tenure with Hillman, she testified that Schaeper never referred to her by her name. Instead, she repeatedly referred to Evans as "girl" or "hey." (Doc. 27, p. 170, 175). On Evans' first day with Hillman, as she got up to leave for lunch, Schaeper said to her, "where you going, girl?" ( Id. at 174-76). Evans "was bothered by it" and felt Schaeper's use of the word "girl" was "maybe to diminish me a bit just by the tone she used, and the fact that, again, this is not usually a phrase you use in professional settings." (Id. at 175). That same day, Schaeper was standing over Evans' shoulder while Evans was typing an email to another employee. (Id. at 179). Evans accidentally misspelled

6

Schaeper's name as "Tina" instead of "Tia", which caused "Tina Bolser" to pop up in the "to:" line. (Id.). Schaeper then said to Evans in a stern tone, "girl, what's wrong with you?" (Id.). In response, Evans said, "girl though?" trying to convey to Schaeper that she did not like being called "girl." (Id. at 180). On Evans' second day with Hillman, another employee, Todd, introduced himself to Evans and told her that he would have introduced himself sooner, but Evans and Schaeper always looked busy. (Id. at 184-85). Schaeper, who was standing nearby, then patted Evans on the shoulder in a condescending way and said she had been "taking notes like a good little girl." (Id.).

Evans argues that Hillman treated former Caucasian employee Matt Baldwin differently that it treated her. Notably, before Evans' employment with Hillman, Schaeper also supervised a Caucasian supply planner named Matt Baldwin. (Doc. 28, p. 292). Baldwin was employed with Hillman from February 5, 2018 to May 3, 2019. (Id. at 317). Baldwin exhibited performance issues while employed with Hillman to the point that Schaeper placed him on a PIP. (Id. at 292). Schaeper took over as Baldwin's manager in January or February of 2019, placed him on the PIP in March, and his performance never improved. (Id. at 317-18). Indeed, Baldwin was not meeting "many things listed on the job description"; he did not sit upright in his chair when working, he did not meet "a lot of personal metrics" for his position, and he did not exhibit a passion and a sense of happiness for being at Hillman. (Id. at 317). Despite exhibiting these performance issues for months under Schaeper's supervision, despite several conversations between Schaeper and Baldwin regarding his performance, and despite being placed on a PIP, Schaeper did not terminate his employment. (Id. at 292). Baldwin voluntarily left Hillman. (Id.).

**II. Analysis**

**A. Summary Judgment Standard of Review**

In a motion for summary judgment, "a court must view the facts and any inferences that can be drawn from those facts ... in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising,* 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted). "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)) (internal quotation marks omitted). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment-rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

The requirement that facts be construed in the light most favorable to the Plaintiff, however, does not mean that the court must find a factual dispute where record evidence contradicts Plaintiff's wholly unsupported allegations. After a moving party has carried its initial burden of showing that no genuine issues of material fact remain in dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992) (citing *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir.1986)). In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986). The non-moving party's evidence "is to be

believed, and all *justifiable* inferences are to be drawn in his favor." *Id.* at 255 (emphasis added). The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

To demonstrate a genuine issue of fact, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587 (citation omitted). It is the Plaintiff's burden to point out record evidence to support his claims. "[T]he Court has no duty when deciding a motion for summary judgment to scour the record for evidence that supports a plaintiff's claims." *Abdulsalaam v. Franklin County Bd. Of Com'rs*, 637 F. Supp.2d 561, 576 (S.D. Ohio 2009) (citing *Williamson v. Aetna Life Ins.Co.,* 481 F.3d 369, 379 (6th Cir. 2007)).

## B. Plaintiff's discrimination claims

1. *Applicable Law*

Title VII provides that "it shall be an unlawful employment practice for an employer…to discriminate against any individual…because of such individual's race, color, religion, sex or national origin[.]" 42 U.S.C. § 2000e-2(a). An employee may base her claim of employment discrimination on a theory of disparate impact or disparate treatment or both. *Lynch v. Freeman*, 817 F.2d 380, 382 (6th Cir. 1987). In the instant case, plaintiff proceeds under the disparate treatment theory of discrimination. Under the disparate treatment theory, the plaintiff must show that the employer has treated some people less favorably than others because of their race, color, religion, sex or national

9

origin. Unlike the disparate impact theory, proof of discriminatory motive is critical in the case of disparate treatment. *Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc.*, 690 F.2d 88, 92 (6th Cir. 1982) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Claims of disparate treatment are analyzed under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 538 (6th Cir. 2002); *Mitchell*, 964 F.2d at 582. The *McDonnell Douglas* burden-shifting analysis requires that plaintiff first establish a *prima facie* case of discrimination. *Id*.

A plaintiff may establish a *prima facie* discrimination claim by either direct or circumstantial evidence. *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 363 (6th Cir. 2010). "Direct evidence of discrimination is 'that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Id*.

A plaintiff who lacks direct evidence of discrimination may establish a *prima facie* case of discrimination through circumstantial evidence by showing that: 1) she is a member of a protected class; 2) she suffered an adverse employment action; 3) she was qualified for the position lost; and 4) she was replaced by an individual outside the protected class. *Mitchell,* 964 F.2d at 582. Plaintiff may also establish the fourth prong of a *prima facie* case of discrimination by showing that she was treated less favorably than a similarly-situated individual outside the protected class. *See Clayton v. Meijer,*

*Inc.,* 281 F.3d 605, 610 (6th Cir. 2002).

If the plaintiff seeks to establish that she was treated less favorably than a similarly situated individual, she must prove that all relevant aspects of his employment situation were similar to those of the employee with whom she seeks to compare herself. *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998). To be similarly-situated in a disciplinary context, the individuals must have dealt with the same supervisor, they must have been subject to the same standards, and they must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for that conduct. *Id*. (quoting *Mitchell,* 964 F.2d at 583); *Smith v. Leggett Wire Co.,* 220 F.3d 752, 762 (6th Cir. 2000). The determination of whether the plaintiff and another employee shared the same supervisor must be made "on a case-by-case basis and does not depend entirely on whether the two shared the same immediate supervisor." *Barry v. Noble Metal Processing, Inc.*, 276 Fed. Appx. 477, 481 (6th Cir. 2008) (citing *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005)). "[I]n many instances, the term 'supervisor' should be construed broadly to include cases where both employees' situations were handled by the same 'ultimate decision-maker.'" *Id*. (citing *McMillan*, 405 F.3d at 414). Accordingly, a plaintiff and a comparable employee who are directly supervised by different individuals may still be similarly situated if the same member of management disciplined both of them. *Id*. (citing *McMillan*, 405 F.3d 405; *Seay v. Tenn. Valley Auth*., 339 F.3d 454, 459 (6th Cir. 2003)).

"[T]he weight to be given to each factor can vary depending upon the particular case." *Johnson v. Kroger Co*., 319 F.3d 858, 867 (6th Cir. 2003). The ultimate question

is whether employees involved in acts of "comparable seriousness" were nonetheless retained. *Clayton*, 281 F.3d at 611 (citing *McDonald v. Santa Fe Transp. Co.,* 427 U.S. 273, 283 n.11 (1976)).

The employer is entitled to summary judgment if the plaintiff does not establish a *prima facie* case. If the plaintiff establishes a *prima facie* case, the employer can overcome the *prima facie* case by articulating a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas,* 411 U.S. at 802. If the employer carries its burden, the plaintiff must show that the reasons offered by the employer were not its true reasons, but were a pretext for discrimination. *Id*. at 804.

The Sixth Circuit has categorized different evidentiary bases for three types of pretext showings: 1) defendant's reasons had no basis in fact; 2) the reasons did not actually motivate the employer's decision; or 3) the reasons were insufficient to warrant the decision. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Financial Services,* 129 S.Ct. 2343 (2009). The first type of showing consists of evidence that the reason offered for the plaintiff's discharge never happened, *i.e.*, the reason is factually false. *Id*. The third showing ordinarily consists of evidence that other employees, particularly those outside the protected class, were not discharged even though they engaged in conduct substantially identical to that which purportedly motivated the plaintiff's discharge. *Id*. If the plaintiff establishes the first or third showing, a permissive inference of discrimination arises. *Id*. For the second showing, where the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal, the plaintiff must introduce additional evidence of discrimination because the

12

reasons offered by the defendant are not directly challenged and therefore do not bring about an inference of discrimination. *Id*.

The Sixth Circuit has cautioned that *Manzer's* three-part test is not to be applied in a formalistic manner. *See Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). Rather, the court must bear in mind that "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Id*. The court must ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation and, if so, how strong the evidence is. *Id*. The 6th Circuit in *Chen* explained,

> At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If so, her prima facie case is sufficient to support an inference of discrimination at trial. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993). But summary judgment is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation. *See Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 148 (2000). ("[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.").

*Id*.

A plaintiff must allege more than a dispute over the facts upon which the discharge was based in order to establish pretext. *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-494 (6th Cir. 2001). He must put forth evidence that demonstrates the employer did not "honestly believe" in the proffered nondiscriminatory reason for its adverse employment action. *Id.* (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998)). An employer has an honest belief in its nondiscriminatory reason for discharging the employee "where the employer reasonably relied 'on the particularized facts that were before it at the time the decision was made.'" *Majewski v. Automatic Data Processing,*

*Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citing *Chrysler Corp.*, 155 F.3d at 807). In determining whether an employer "reasonably relied on the particularized facts then before it," it is not necessary that "the decisional process used by the employer be optimal or that it left no stone unturned." *Braithwaite*, 258 F.3d at 493 (quoting *Chrysler Corp.*, 155 F.3d at 807). "Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* (citing *Chrysler Corp.*, 155 F.3d at 807). As long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect. *Majewski*, 274 F.3d at 1117 (citing *Chrysler Corp.*, 155 F.3d at 806).

Summary judgment in favor of a defendant is appropriate where the plaintiff fails to establish a *prima facie* case or is unable to demonstrate pretext sufficient to rebut the defendant's legitimate, non-discriminatory reasons. *Barnhart v. Peckrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1395 (6th Cir. 1993). "The ultimate burden of persuasion remains with the plaintiff to prove that the employer's reasons were a pretext for discrimination *and* that the employer intended to discriminate on the basis of race." *Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1164, 1166 (6th Cir. 1996)(emphasis in the original) (citing *Hicks*, 509 U.S. at 502). The finder of fact may infer discrimination from the elements of a prima facie case, coupled with its disbelief of the rationale articulated by the employer. *See Hicks,* 509 U.S. at 511 ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons,

will permit the trier of fact to infer the ultimate fact of intentional discrimination . . . 'no additional proof of discrimination is required. . . .').  *See also Barnett v. Department of Veterans Affairs*, 153 F.3d 338, 341 (6th Cir. 1998); *E.E.O.C. v. Yenkin-Majestic Paint Corp.,* 112 F.3d 831, 835 (6th Cir. 1997); *Thurman,* 90 F.3d at 1166-67.

   *2.  No direct Evidence of Discrimination*

   Plaintiff argues that Schaeper's use of the word "girl" on three occasions is direct evidence of racial animus towards Evans.  Notably, "in Title VII cases, direct evidence 'is evidence that proves the existence of a fact without requiring any inferences.'" *Burke-Johnson v. Dept. of Veterans Affairs*, 211 Fed. Appx. 442, 451 (6th Cir. 2006) (*quoting Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006)) (Emphasis added). It must be evidence that is "free of inferences and that, if believed, requires a finding that 'unlawful discrimination was at least a motivating factor in the employer's actions.'" *Halfacre v. Home Depot, U.S.A., Inc.*, 221 Fed. Appx. 424, 428 (6th Cir. 2007) (*quoting Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2007)) (Emphasis added).

   Here, Plaintiff contends that during her three days with Hillman, Schaeper never addressed her by her name. Instead, Schaeper repeatedly called her "girl" or "hey."  In this regard, Plaintiff notes that, "the Supreme Court has held the use of the word 'boy' to refer to African American male plaintiffs has racial undertones that may be evidence of an employer's racial animus, 'depend[ing] on various factors including context, inflection, tone of voice, local custom, and historical usage.'" (Judge Barrett's Order, Doc. 16, PageID 109-10, *quoting Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006)). See also *Strickland v. City of Detroit*, 995 F.3d 495, 504 (6th Cir. 2021) ("Although not explicitly racial, a white officer referring to an adult African American colleague as 'boy,' without

'modifiers or qualifications' can qualify as evidence of impermissible racial bias."); *Bailey v. USF Holland, Inc*., 526 F.3d 880, 885 (6th Cir. 2008) ("some of the conduct was, on its face, clearly racially motivated—such as the continued use of the terms 'boy,' 'hey boy,' 'damn it boy,' and variations thereof").

As noted above, "in Title VII cases, direct evidence 'is evidence that proves the existence of a fact without requiring any inferences.'" *Burke-Johnson v. Dept. of Veterans Affairs*, 211 Fed. Appx. 442, 451 (6th Cir. 2006).  Here, as noted by Defendants, Evans offers her subjective belief and speculation that the term must have been derogatory, which is insufficient to state a claim for discrimination. *Hillery v. Fifth Third Bank*, No. 2:08-cv-1045, 2009 U.S. Dist. LEXIS 39658, *5 (May 11, 2009).

Plaintiff herself admitted that the word "girl" has no racial animus or connotation but rather the context in which it is used can make it offensive:

Q. You would agree with me that the world "girl" by itself in a vacuum is not derogatory or otherwise racially insensitive, correct?
…
A.  By itself?

Q. Yes.

A. No. I believe it is used to refer to girls.

Q. Right…. The contention isn't that the word "girl" itself is derogatory. It's the way that – if its used in a certain way can be derogatory, correct?

A. Well, I think for me, my mom can call me girl, but I wouldn't call another woman girl.

Q. It's the context[.] It's the person who's saying it[.] It's the way that the word is used, the tone that is used, the context in which it was used could make it derogatory, correct?
A. Could, yes.

(Doc. 27, at 34:8-35:2).

Plaintiff further testified that she also never raised the issue with Schaeper or otherwise confirmed her subjective interpretation. (Id. at 31:9-23, 32:12-33:18, 36:15-37:13, 50:23-52:5, 70:1-71:5, 71:18- 72:1

Based on the foregoing, Defendants contend that Plaintiff relies on inferences to claim that the alleged use of the word "girl" is evidence of race discrimination. Such circumstantial evidence is the antithesis of direct evidence, and Plaintiff therefore cannot rely on that word to claim the *McDonnell-Douglas* framework does not apply. The undersigned agrees.

The undersigned also recognizes that in denying Defendants' prior motion to dismiss in this case and citing *Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006),* Judge Barret determined that "it is plausible that the same factors could support a finding of racial animus where a Caucasian supervisor refers to her older, African-American employee as "girl." (Doc. 16).  However, Judge Barrett further noted:

> This determination is better suited for a later stage in the litigation. Accordingly, in *Wash v. Quest Diagnostics*, Inc., a case cited by Defendants, the court determined that the plaintiff had not provided evidence that her supervisor's reference to her as "hey, girl" actually related to her race. Case No. 08-61863-CIV, 2010 WL 11504202, at *24 (S.D. Fla. June 29, 2010), report and recommendation adopted, No. 08-61863-CIV, 2010 WL 11504206 (S.D. Fla. July 22, 2010). The court concluded that even if the phrase were a derogatory remark directed at the plaintiff based on her race, the defendant was entitled to summary judgment on Plaintiff's hostile work environment claim because use of the phrase does not describe conduct that is severe or pervasive enough to be actionable under Title VII. Id. The court also found that the supervisor's use of the phrase "hey, girl" could not constitute direct evidence of discrimination because there was evidence in the record that the supervisor used it to refer to individuals outside of the plaintiff's protected class. Id. at *17, n.23.

(Id. At PageID 110).

Here, there is no evidence that Schaeper's alleged use of the word "girl" was

related to Plaintiff's race.  Schaeper's undisputed testimony is that she generally uses the term "girl" when interacting with friends, coworkers, her sisters, and her family. With respect to male colleagues, she testified that she will refer to them as "dude" or "man," as in "hey dude" or "hey man." See Schaeper Dep. at 106:14-16, 107:25- 108:3.. (Doc. 30-1, at ¶ 40).  Furthermore, Plaintiff fails to cite any binding caselaw finding that the word "girl" holds the same inference of racial undertones as the word "boy" as detailed above. See *Ash*, 546 U.S. at 456; *Strickland,* 995 F.3d at 504.

In light of the foregoing, the undersigned finds that Plaintiff has failed to provide any direct evidence of racial discrimination.  As such, the Court will apply the *McDonnell-Douglas* burden shifting framework to Plaintiff's claims of racial discrimination.

### 3.  Prima Facie Case of Discrimination

For purposes of summary judgment only, Defendants concede that Evans can establish a *prima facie* case of race discrimination.

### 4.  Defendant's legitimate non-discriminatory reason for terminating Plaintiff

Next, the burden shifts to Defendant to proffer a legitimate, nondiscriminatory business purpose for its actions. In this regard, Defendants contend that it terminated Evans because she appeared disengaged and unhappy with her job. After three days of training, Schaeper believed that Evans looked bored, was on her phone, and was not paying attention during meetings. Considering her demeanor, Hillman determined that Evans was not a good fit for the role.

Plaintiff argues that her perceived lack of engagement and interest in her position—is not "legitimate" because she disagrees with Defendants' perception of her work behavior.  She argues that the reasons given by Defendants for her termination were

not true, that she was engaged, did take notes, and was happy to be there.

Notably, the requirement that an employer articulate a legitimate non-discriminatory reason for the subject adverse action is "merely a burden of production, not of persuasion, and does not involve a credibility assessment." *Upshaw v. Ford Motor Co.,* 576 F.3d 576, 585 (6th Cir. 2009). *See also Bd. of Trustees of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 fn. 2 (1978) (noting that "the employer's burden is satisfied if he simply 'explains what he has done' or 'produces evidence of legitimate nondiscriminatory reasons."). Here, Defendants have produced evidence of a legitimate, non-discriminatory reason for Hillman's termination decision.

As noted by Defendants, in arguing that Defendants' stated reason for her termination—Plaintiff's perceived lack of engagement and interest in her position—is not "legitimate" because she disagrees with Defendants' perception of her work behavior, is an argument relating to pretext, the next step in the *McDonnell-Douglas* burden shifting framework. Thus, Defendants having proffered a non-discriminatory reason for Hillman's termination decision, the burden shifts back to Plaintiff to persuade the Court through competent evidence that this reason is pretext for discrimination.

5. *Pretext*

Last, in order to defeat summary judgment, Plaintiff must show that the reasons offered by Defendants were not its true reasons for terminating Plaintiff but were a pretext for discrimination. In this regard, Plaintiff claims she can establish pretext because questions of fact remain as to whether Evans was "disengaged and unhappy with her job." Plaintiff further contends that Defendants tolerated the same behavior and attitude from Matt Baldwin, a Caucasian male, for months without terminating his employment.

Plaintiff's assertions will be addressed in turn.

### A.  Demeaner and Body Language

Here, Plaintiff contends that contrary to Schaeper's assertions, she was not disengaged and unhappy with her job.  In this regard, Plaintiff contends that she took notes on her computer during her three days of training at Hillman. (See Doc. 27, p. 190). In fact, when Schaeper accused Evans of not taking notes during the termination meeting on July 18, 2019, Evans challenged that claim, stating, "you actually have commented on how well I've taken notes." Id.  Schaeper then recanted and said, "Well, I'm not saying you didn't take any notes." Id. Further, during training sessions with Schaeper, Plaintiff claims that she would lean over to see Schaeper's computer screen with a look of serious intent to learn the process, nodded when Schaeper asked her if she understood, and tried to absorb the information so she could create notes. Id. at 185.

As such, Plaintiff contends that she did not exhibit any signs or indication she wanted to resign or that she was unhappy with her position at Hillman, and until Evans' third day with Hillman, Schaeper never addressed her purported lack of engagement. Evans never told Schaeper she was unhappy or did not want to be at Hillman. She did not pack up her cubicle or demand a severance package. She never complained to Schaeper or anyone else at Hillman about her job or her duties. She never even had the chance to demonstrate any performance issues, as Schaeper never assigned Evans any tasks aside from reading training materials at her desk.

In response to Defendants' motion for summary judgment, Plaintiff further contends that there remain genuine questions of fact as to whether Evans was actually disengaged, unhappy, taking notes, asking questions, nodding her head, etc. Rather,

Schaeper's own testimony supports the argument that her perception of Evans' engagement and happiness with her job was because Evans "did not match the same body language, didn't exhibit the same expressions as other (Caucasian) members on the team." Doc. 28, p. 304. Schaeper's expectations of how Evans should look and act were based on her comparing Evans' appearance, demeanor, and attitude to all her coworkers, all of whom were Caucasian. Id. at 310-11, 314. Schaeper told Evans she did not look engaged and looked bored because of how Evans' face looked. Doc. 27, pp. 185-86.

Defendants argue, however, that Plaintiff simply disagrees with Schaeper's perception of her as disengaged and disinterested in her job, which is insufficient to establish pretext. Notably, if Plaintiff was interested and engaged, that does not convert Schaeper's mistaken belief into a discriminatory one. *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) (citing *Clay*, 501 F.3d at 713-15) ("When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'"). Thus, Defendants argue that terminating someone because they give the impression of being bored and unhappy is not discriminatory, nor is it evidence of pretext. The undersigned agrees.

Here, there is no testimony—from Plaintiff, from Schaeper, from Weber, from anyone—regarding Plaintiff's purported inability to "conform" to alleged Caucasian stereotypes. Defense counsel asked Plaintiff at her deposition to identify all the reasons why she felt discriminated against during her employment with Hillman. Plaintiff offered a list of reasons why she felt she had been wronged but failing to conform to racial

21

stereotypes was not one of them. (Doc.. 27, at 13:2-18:24; 133:25-134:8). Moreover, there is no testimony (or even suggestion from Plaintiff in her Opposition) as to what the alleged stereotypes are – being engaged at work and appearing interested in one's job are not racial stereotypes.[3]   Accordingly, Plaintiff has failed to establish evidence of pretext in this regard.

### B.  Matt Baldwin

Plaintiff next argues that Defendants' proffered reason was insufficient to motivate Evans' termination because "similarly situated employees were treated differently." *Barker*, 2019 WL 4040533 at *11. Notably, a plaintiff may offer evidence of similarly situated coworkers who were treated more favorably to raise a genuine issue of fact that the defendant's proffered reasons did not actually motivate its actions." *Merendo*, 2019 WL 955132 at *12. Here, Plaintiff argues that a similarly situated Caucasian employee, Matt Baldwin, was treated more favorably than Plaintiff and placed on a performance improvement plan (PIP).

 As noted above, Hillman placed Mr. Baldwin on a PIP because he suffered from deficiencies relating to job performance. In this regard the record indicates:

Q. Tell me what kind of performance issues was Matt [Baldwin] having?

A. So you pulled up the job description earlier. There are many things listed on the job description that he was not meeting. So we measure a lot of metrics. So one of the things is the timeliness of when a supply planner cuts a purchase order, their timeliness of replies. There's a lot of personal metrics that it can tie to a planner that we can measure, and he wasn't meeting those.

---

[3] Plaintiff's contention, made for the first time in response to Defendants' Motion, is misplaced.  *See Desparois v. Perrysburg Exempted Vill. Sch. Dist.,* 455 Fed. Appx. 659, 666 (6th Cir. 2012) ("A plaintiff may not expand his claims to assert new theories for the first time in response to a summary judgment motion.").

(Doc. 28, at 118:24-119:9).

Moreover, even if the Court considered Plaintiff and Mr. Baldwin to be similarly situated, this fact only helps establish Plaintiff's *prima facie* case (which Defendants have already stated they do not argue against at this stage). It does not warrant finding pretext for race discrimination.

Furthermore, Plaintiff also contend she was not "given the chance" to improve at Hillman and that it was unfair for her to be separated after only three days of work -i.e., the reason for termination was not sufficient to warrant the decision. Importantly, however, Title VII and state anti-discrimination statutes "do not act as a 'super personnel department,' overseeing and second-guessing employers' business decisions." *Romano v. Hudson City Sch. Dist.*, 772 Fed. Appx. 258, 267 (6th Cir. 2019) (quoting *Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 626 (6th Cir. 2006)). Plaintiff was an at-will employee. Plaintiff's assertion that she feels she was not given a "chance" at Hillman does not cast doubt on the employer's explanation.

In light of the foregoing, Plaintiff has failed to rebut defendant's legitimate non-discriminatory reasons for her termination and has failed to produce any evidence that Defendant intended to discriminate against plaintiff on the basis of race. *See Thurman*, 90 F.3d at 1166 (citing *Hicks*, 509 U.S. at 502) ("The ultimate burden of persuasion remains with the plaintiff to prove that the employer's reasons were a pretext for discrimination and that the employer intended to discriminate on the basis of race.)" Although the summary judgment standard requires that evidence of record be viewed in the light most favorable to the nonmoving party, it does not require that all bald assertions, opinions, or even genuinely held beliefs asserted by the nonmoving party be adopted

wholeheartedly by a court. *Diaz v. Mitchell's Salon and Day Spa, Inc.*, Case No. 1:09-cv-882, 2011 WL 379097, * 7 (S.D. Ohio 2011) (J. Weber). Plaintiff's unsupported conclusions are insufficient to meet her burden of establishing that Defendant's proffered reasons for her termination were a pretext for racial discrimination.

*C. Same Actor Inference*

Defendants also contend that the Court should apply the "same actor inference" to support the conclusion that impermissible racial animus was not a factor in Defendants' decision to terminate Plaintiff. The same actor inference holds that "when the same person who hired the plaintiff also fired the plaintiff...a presumption can arise that an employee's race did not motivate the termination because the sort of person who would discriminate against a particular race would not also hire someone of that race." *Garrett v. Southwestern Med. Clinic*, 631 Fed.Appx. 351, 355 (6th Cir. 2015). The Sixth Circuit allows, but does not require, a court to use the same actor inference to infer that discrimination was not the motivating factor for terminating employment if evidence supporting a finding of discrimination is weak. *See id.*

Here, Plaintiff was interview by Defendant Schaeper and was hired based upon Schaeper's recommendation. Schaeper was also the individual who brought Plaintiff's behavior to the attention of Cornett and Corbitt, who decided to terminate Plaintiff' based solely upon the information provided to them by Schapepr. As such, the same actor inference applies in this case. See *Nailon v. Univ. of Cincinnati*, No. 1:15-CV-200, 2016 WL 6581839, at *5 (S.D. Ohio Nov. 7, 2016), *aff'd in part,* 715 F. App'x 509 (6th Cir. 2017) ("the fact that Defendant Jones was inclined to hire an African-American employee weighs against any inference that she sought to have an African-American employee

terminated on account of her race.)"  Moreover, even if the same actor inference did not apply, the fact that one of the decision makers, Kim Corbitt, is a black women is also a strong fact that weighs against pretext.  (Doc.38-2, PageID 672).

In sum, as noted by Defendant, this is a case of dueling perceptions. Schaeper perceived Evans as disengaged and disinterested in a position in which she had only recently started. Evans disputes that and, alternatively, perceived certain words used by Schaeper as evidence of race discrimination. The difference between these perceptions is that Schaeper's establishes a legitimate, non-discriminatory reason for Evans' termination. Plaintiff has failed to show that the record contains evidence to question the legitimacy of Defendants' non-discriminatory reason for terminating Evans' employment—her perceived disinterest and disengagement—as pretext for race discrimination.  As noted above, "[t]he law does not . . . forbid [employers] from making decisions that others may disagree with." *Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996). It simply prohibits illegal discrimination.

Thus, while Plaintiff may dispute Schaeper's perception of her work ethic and believe it was unfair to be terminated after three days of employment, the record evidence does not suggest that she was terminated because of her race. Evans' own opinion and speculation, even when viewed in a light most favorable to her, does not create material fact issues as to whether Evans suffered unlawful race discrimination. As such, the undersigned finds that Defendants motion for summary judgment is well-taken.[4]

---

[4] Defendants' motion for summary judgment with respect to Plaintiff's aiding and abetting claim against Schaeper under Ohio law (County III) is also well-taken. In this regard, the Court finds that there is no evidence of discriminatory motive on the part of Schaeper, such that she could not have "aided and abetted" any alleged discriminatory action as a matter of law. Furthermore, Plaintiff's Opposition makes no argument in response to the arguments in Defendants' Motion for the dismissal of Plaintiff's aiding-and-abetting claim against Schaeper.

### III.  Conclusion

For these reasons, **IT IS THEREFORE ORDERED THAT** Defendants' motion for summary judgment (Doc.30) is **GRANTED.**  As no matters remain pending, this case is **CLOSED**.

 _s/Stephanie K. Bowman_
Stephanie K. Bowman
United States Magistrate Judge